CONCRETE WORKS OF COLORADO, INC., a Colorado corporation, Plaintiff,

v.

The CITY AND COUNTY OF DENVER, COLORADO, a municipal corporation, Defendant.

Civ. A. No. 92–F–21.

United States District Court, D. Colorado.

Feb. 26, 1993.

Thomas C. Clark, Daniel M. Gross, Oviatt, Clark & Gross, Wheat Ridge, CO, William Perry Pendley, Todd S. Welch, John G. Nelson, Denver, CO, for plaintiff.

Angelina Irizarry, Irizarry & McCall, P.C., Norman R. Bangeman, Asst. City Atty., City & County of Denver, Denver, CO, for defendant.

## ORDER REGARDING MOTION FOR SUMMARY JUDGMENT

SHERMAN G. FINESILVER, Chief Judge.

This is a case involving a constitutional challenge to a local ordinance regarding women and minority business enterprises. The ordinance in question deals with city-funded public works projects. The instant matter comes before the Court on the motion of Defendant City and County of Denver ("Denver" or "the City") for summary judgment under Fed.R.Civ.P. 56. Jurisdiction is based on 28 U.S.C.A. §§ 1331 and 1343(a)(3) and (4). The parties have fully briefed the matter and an oral argument was held on December 8, 1992. For the reasons stated below, including our belief that the ordinance in question does not establish a quota, the motion is GRANTED.

*Summary*

The Court finds that the ordinance in this case is a modest, flexible, and historically supportable response to what the Denver City Council reasonably believed to be discrimination in contracting. Far from establishing quotas or set-asides, the ordinance establishes, at most, nonbinding, good-faith aspirational goals to encourage participation of minority subcontractors in public works projects funded by the City of Denver. We find the ordinance responds to a compelling and established governmental interest. The evidence upon which it is based is an exhaustive compilation of federal studies, anecdotal evidence, independent analyses, city council hearings, census data, and statistical studies on which any city council could reasonably rely to infer the presence of discrimination.

The ordinance is also narrowly tailored to address the problem of discrimination in city contracting. It follows and joins many race- and gender-neutral efforts by the City of Denver to alleviate the problem. No minority or woman is preferred for a contract on the basis of being a minority or woman, rather, all prime contractors are subject to the same race-neutral requirement that they show good faith efforts to solicit bids from subcontractors owned and controlled by minorities and women. It is not necessary that those good faith efforts succeed, and there are numerous waivers through which prime contractors may avoid the provisions of the ordinance. The City and County of Denver sets goals in only a small portion of contracts, in a flexible consideration of numerous factors, on a project-by-project basis, and rarely reaches even the goals it sets. The ordinance is therefore a constitutionally permissible means of affirmative action.

### I. Background

On September 4, 1990, the Denver City Council ("the Council") enacted Ordinance No. 513, Series of 1990 ("the Ordinance"). Denver, Co., Rev.Mun.Code ch. 28, art. III, § 28–31 *et seq.* The Ordinance states that its aim is to undertake limited remedial activities which will help certified racial minority-("MBE") and women-owned ("WBE") business enterprises to participate in the awarding of contracts for City-funded public works projects. *Id.* § 28–53. The Ordinance includes as racial minorities persons of Black, Hispanic, Asian–American, or American Indian descent. *Id.* § 28–54(16). In order to be certified as an MBE or WBE (collectively, "a W/MBE"), a business must: (1) be 51% owned by one or more eligible racial minorities or women; (2) be managed and controlled by the minority or woman seeking certification; (3) credibly demonstrate by written documentation or affidavit that it has suffered from past racial or gender discrimination in the Denver construction industry;[1] (4) have been in business for at least three

---

1. However, the Ordinance also provides a rebuttable presumption of past discrimination to any "MBE, WBE, woman or minority" that conducted or attempted to conduct business in the Denver construction industry prior to June 1, 1990. *Id.* § 28–73(c).

months; and (5) not exceed certain annual revenue or receipt levels. *Id.* §§ 28–73, 28–74.

The Ordinance provides for the Director of the Office of Contract Compliance ("OCC") to set goals for the level of W/MBE participation in construction contracts. The maximum allowable goal for MBE participation as a percent of annual construction dollars spent is 16%; the goal for WBEs is 12%. The maximum allowable goal for both MBE and WBE participation as a percent of dollars spent on professional design services is 10%. *Id.* § 28–55. The OCC is required to set the participation goals on a project-by-project basis depending upon the availability and capacity of W/MBEs with respect to each project. *Id.* § 28–56.

Once the goals are set for a project, all bidders, including MBEs, WBEs, noncertified minority- and woman-owned businesses, and nonminority-owned businesses, are required either to satisfy the project goals in one of several ways or to demonstrate good faith efforts to meet the project goals. Project goals can be partially satisfied by (1) the "commercially useful function" of work if the bidder is an MBE or WBE; (2) the commercially useful function of work in which the bidder forms a joint venture with an MBE or WBE; and (3) the bidder's use of MBEs or WBEs as subcontractors. *Id.* § 28–57.

Section 28–58 states that "[i]f the bidder has not fully met the project goals as required in section 28–57, then the bidder shall demonstrate that it has made good-faith efforts to meet the goals." *Id.* § 28–58. A bidder who fails to satisfy the project goals must establish good-faith efforts toward doing so by furnishing a statement in which the bidder details its compliance with numerous good-faith requirements.[2] If the OCC determines that the bidder has not fully complied with the requirements to make good faith efforts to obtain W/MBE participation and to provide documentation of those efforts, the bidder's bid will be rejected as nonresponsive. *Id.* §§ 28–58, 28–59. However, once the OCC determines that a bidder has failed to meet project goals and failed to demonstrate good-faith efforts to do so, the bidder may nevertheless request an informal meeting with the OCC Director. The bidder also has additional time to clarify or modify its good-faith efforts statement. *Id.* § 28–59(c). The Ordinance provides that if a bidder is rejected, it may seek administrative or judicial review of the OCC's decision. *Id.* § 28–33.

There are several aspects of the good-faith requirements and goals that deserve special mention. First, a bidder who does not enter into a contract with a qualified W/MBE that has quoted the bidder the lowest price for the subcontract work will be deemed nonre-

---

2. The requirements to establish good faith are: (1) a showing of knowledge of any information provided at pre-bid meetings designed to inform W/MBEs of subcontracting opportunities; (2) verification of advertisements soliciting bids from MBEs and WBEs for three consecutive days in general or construction-related publications; (3) verification of efforts to contact by timely written notice all appropriate WBEs or MBEs within identified subcontracting categories; (4) verification of efforts to subcontract, according to industry practice, with the WBEs and MBEs whom the bidder has contacted or who have contacted the bidder; (5) verification that the bidder attempted to recruit WBEs and MBEs from at least the same geographic area from which it attempted to recruit other subcontractors and other members of a joint venture; (6) verification that, consistent with industry practice, the bidder gave WBEs and MBEs necessary access to and adequate time to review all necessary project plans as well as adequate time to prepare subcontract bids or negotiate joint ventures; (7) verification that, reasonably consistent with industry practice

and the bidder's past practice on similar projects, the bidder selected portions of the work to be performed by WBEs and MBEs in order to achieve the project goals, including consideration of structuring the contract into economically feasible units to facilitate meaningful MBE and WBE participation as subcontractors or suppliers; (8) for each WBE and MBE who contacted the bidder or whom the bidder contacted or attempted to subcontract with, consistent with industry practice, a statement giving the reasons why the bidder and the WBE or MBE did not succeed in reaching a subcontracting or joint venture agreement; (9) verification that the bidder rejected WBEs and MBEs because they did not submit the lowest bid or were not qualified (i.e., having the financial ability, skill, experience, and access to the necessary staff, facilities, and equipment to complete contracts or subcontracts, *Id.* § 28–54); and (10) verification that the bidder made efforts to assist WBEs and MBEs in obtaining bonds if any are required. *Id.* § 28–58.

sponsive. *Id.* § 28–58(9). However, a bidder is not required to use an MBE or WBE as a subcontractor if the MBE or WBE failed to submit the lowest bid or was otherwise unqualified to perform the work. Second, the Ordinance allows W/MBE prime contractors to use their own participation to meet a project's W/MBE goals, thereby potentially reducing the efforts which those prime contractors must undertake to show good faith attempts to obtain W/MBE participation.

Finally, since the enactment of the Ordinance, the City has not set goals on all projects and has met the goals it sets only part of the time. For example, in 1990, W/MBE participation goals were met on only 16 of the 48 construction contracts awarded (33%). In 1991, the first full year under the Ordinance, goals of 0% W/MBE participation were assigned to 18 of 75 contracts (24%). Higher goals were met on only 47 of 75 contracts (63%). Overall, despite the utilization goals of 16% for MBEs and 12% for WBEs, only 12.4% MBE and 5.9% WBE utilization was attained on City construction contracts.

On January 6, 1992, Plaintiff Concrete Works brought suit for a permanent injunction against enforcement of the Ordinance, alleging that the Ordinance was unconstitutional under the U.S. and Colorado constitutions. Concrete Works claimed that the Ordinance's "preferences" or "quotas" for W/MBE participation had caused it to be refused three construction contracts. First, Concrete Works claimed that on November 8, 1991, the City rejected its bid on Project No. W75–130A, Lakewood & Dry Gulch Storm Drainage Improvements—Phase One ("Lakewood & Dry Gulch Project") for failure to comply with either the project W/MBE participation goals or good-faith efforts. Concrete Works claimed that although its bid of $2,007,822 was the lowest bid, the City contracted with a bidder whose bid was approximately $25,000 higher than Concrete Works'.

Second, Concrete Works claims that for similar reasons, on October 28, 1991, the City rejected as nonresponsive its bid on Project No. 91–205, Colorado Boulevard Median Improvements ("Colorado Boulevard Project").

Concrete Works claimed on information and belief that the City intended to award the contract to the third-lowest bidder, Valley Crest Landscape, whose bid was $207,000 higher than the $799,955 of Concrete Works.

Finally, Concrete Works alleges that the City rejected its bid on Project No. 89–396B1, B4, and B7, Sixth and Josephine Improvements ("Sixth Avenue Project") for the same failure to comply with the good-faith requirements of the Ordinance. The contract was awarded to the second-lowest bidder, MBE Technology Constructors. Concrete Works challenged the City's determination of its nonresponsiveness in an administrative hearing under the Ordinance, but the determination was affirmed. Concrete Works claimed that it lost the contract because, unlike the MBE that won the contract, it was not able to count its own work toward fulfillment of the project goals or good-faith requirements.

## II. Standing

█ A party possesses standing to sue if he or she has personally suffered some actual or threatened injury that is fairly traceable to the challenged conduct and likely to be redressed by a favorable decision. *Valley Forge Christian College v. Americans United for Separation of Church and State,* 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982); *Riggs v. City of Albuquerque,* 916 F.2d 582, 584 (10th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 1623, 113 L.Ed.2d 720 (1991). The actual injury requirement may be satisfied by the economic losses a business suffers due to the application of a government rule. *Mountain States Legal Foundation v. Costle,* 630 F.2d 754, 764 (10th Cir.1980). A denial of an opportunity to compete for government contracts on an equal basis with members of statutorily favored groups also satisfies the actual injury requirement. *Cunico v. Pueblo School Dist. No. 60,* 917 F.2d 431, 441 (10th Cir.1990). The party challenging a law or ordinance has the burden of persuasion of showing that it has standing. Whether a party possesses standing is a question of law for the district court to determine. *Motive Parts Warehouse v. Facet Enterprises,* 774 F.2d 380, 389 (10th Cir.1985).

In order to prosecute a constitutional claim, the injury requirement must be met by a showing that the plaintiff has suffered or is likely to suffer a deprivation of a constitutional right. *Cone Corporation v. Florida Dept. of Transportation,* 921 F.2d 1190 (11th Cir.1991), *cert. denied,* —— U.S. ——, 111 S.Ct. 2238, 114 L.Ed.2d 479 (1991) (*"Cone Corp."*). A determination of whether a party has been so injured necessarily involves an inquiry into the merits of the plaintiff's claims. *Id.* at 1204, n. 45. In order to determine whether Concrete Works has standing, the Court must decide whether there is any basis for Concrete Works' allegation that it has been deprived of equal protection by reason of race or gender.[3]

It is undisputed that City contracts are awarded to the lowest responsive bidder, regardless of race or gender. Significantly, Concrete Works has never been refused a contract *because* it is a nonminority contractor; all of Concrete Works' failures are directly attributable to its failure to *respond* to, or fulfill, the good faith requirements. Concrete Works' challenge therefore would be more accurately framed as an attack on the requirement of "responsiveness," rather than through allegations of a racial or gender preference in the awarding of contracts.

Absent some injury, we see no racial classification or preference *regarding prime contractors* in the requirement that contractors be responsive, or solicit bids from certain types of subcontractors. That those subcontractors are to be minorities is of no import where the party seeking standing has alleged no injury attributable to a preference accorded minority subcontractors. *Cf. Harrison & Burrowes Bridge Constructors v. Cuomo,* 743 F.Supp. 977 (N.D.N.Y.1990) (finding monetary losses and threatening letters from state officials constituted injury due to minority participation program). The identity of the prime contractors and any burdens alleged to have been placed upon them must be analytically distinguished from the identity of the subcontractors and any measures required to be taken, by all contractors, on their behalf. Whether a nonminority prime contractor is merely encouraged to contact minority subcontractors is an entirely different question from whether a nonminority prime contractor suffers a unique detriment due to a preference accorded a minority. This latter question is what we shall now examine.

Concrete Works has not established that it was refused a contract because of the race or gender of its owner. In Concrete Works' three examples of discrimination, Concrete Works failed to win each particular contract solely because it failed to comply with the good-faith requirements. Concrete Works does not allege that the prime contractors who ultimately won the contracts on the Lakewood & Dry Gulch and Colorado Boulevard Projects were even WBEs or MBEs; indeed, Denver contends that both prime contractors were owned by white males. Concrete Works does point with specificity to the Sixth Avenue Project as evidence that it was discriminated against when the City awarded the project to an MBE which came in second in the bidding. However, Concrete Works failed to show good faith efforts in its bid for the Sixth Avenue project. Under the Ordinance, it is clear that a contracting firm owned by white males could have also won the contract from Concrete Works merely by showing good faith or by meeting the project goals. We do not believe that Concrete Works has lost a contract due to a racial preference, but rather because Concrete Works failed to carry out the same race- and gender-neutral requirements applicable to all contractors.

Furthermore, although Concrete Works claims to have lost three contracts due to the requirements of the Ordinance, Concrete Works won at least one contract, Project No.

---

**3.** All six of Plaintiff's claims, including claims based on 42 U.S.C.A. § 1981 and the Colorado Constitution, are co-extensive with the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution. *See, e.g., Setser v. Novack Investment Co.,* 657 F.2d 962, 966–67 (8th Cir.1981), *cert. denied,* 454 U.S. 1064, 102 S.Ct. 615, 70 L.Ed.2d 601 (1981); *Valentine v. Smith,* 654 F.2d 503, 512 (8th Cir.1981); *Local Union No. 35 of the International Brotherhood of Electrical Workers v. City of Hartford,* 625 F.2d 416, 425 (2nd Cir.1980), *cert. denied,* 453 U.S. 913, 101 S.Ct. 3148, 69 L.Ed.2d 997 (1981); *Collier v. Krane,* 763 F.Supp. 473, 475 (D.Colo.1991); *Lujan v. Colorado State Board of Education,* 649 P.2d 1005, 1014 (Colo.1982)

W90–297, despite attaining 0% MBE participation in the face of an MBE project goal of 15%. Concrete Works won another contract, Project No. 85–112A, even though it was not the lowest bidder because the lowest bidder failed to comply with the Ordinance. Concrete Works won the contract because it succeeded in showing good faith efforts. In our view, Concrete Works' success in obtaining the contract due solely to its good faith efforts to involve W/MBE participants cannot be said to have conferred a racial preference on Concrete Works. Similarly, Concrete Works' failures to win other contracts cannot be ascribed to the fact that the company is owned by a white male. "The appropriate test is 'but for': But for the plaintiff's race, or gender, would he have been disadvantaged by the challenged statute?" *Contractors Association of Eastern Pennsylvania v. Philadelphia*, 945 F.2d 1260 (3d Cir.1991) (Higginbotham, J., concurring); *see also Los Angeles, Dept. of Water & Power v. Manhart*, 435 U.S. 702, 711, 98 S.Ct. 1370, 1377, 55 L.Ed.2d 657 (1978). The minority status of the MBE contractor who prevailed over Concrete Works was not the but for cause of Concrete Works' rejection.

However, Concrete Works also claims that the ability of W/MBEs to use their own work in satisfaction of the project goals gives the W/MBEs an unfair competitive advantage. Denver maintains that the Ordinance contains no requirement that a contractor must meet the *project goals* in order to be deemed the lowest responsive bidder; W/MBEs and nonminority contractors alike have two routes of compliance open to them, each equally valid in establishing responsiveness: meet the goals *or show good faith.* Therefore, a nonminority contractor which established its good faith efforts would be on equal footing, if the bid amounts were equal, with a WBE or MBE that partially used its own work to meet project goals. In other words, nonminority contractors may be deemed responsive under race- and gender-neutral means of establishing good faith. There is some force to this argument.

Still, it is clear that nonminority prime contractors have open to them fewer avenues by which to achieve a determination of their responsiveness. Non-minority prime contractors arguably suffer some slight injury due to their inability to use their own efforts in fulfilling one of the two avenues leading toward responsiveness. Although we believe Concrete Works' arguments for standing to be extraordinarily weak, *cf. Associated General Contractors of California v. Coalition for Economic Equity*, 950 F.2d 1401, 1407 ("*AGCC II*") (five percent bid preference created objectively unequal bidding process and the resulting uneven playing field is a legally cognizable injury); *O'Donnell Construction Co. v. District of Columbia*, 762 F.Supp. 354, 362 (D.D.C.1991) (inability to compete for all of district's contracts instead of merely a specified percentage constituted injury), we note that the issue of standing in this case is so closely tied to the merits of Concrete Works' claim that we feel compelled to grant standing and proceed to evaluate Concrete Works' claim on the merits.

### III. Summary Judgment Standard

■ Granting summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c); *Ash Creek Mining Co. v. Lujan*, 934 F.2d 240, 242 (10th Cir.1991); *Metz v. United States*, 933 F.2d 802, 804 (10th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 416, 116 L.Ed.2d 436 (1991); *Continental Casualty Co. v. P.D.C., Inc.*, 931 F.2d 1429, 1430 (10th Cir.1991). A genuine issue of material fact exists only where "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Merrick v. Northern Natural Gas Co.*, 911 F.2d 426, 429 (10th Cir.1990). Only disputes over facts that might affect the outcome of the case will properly preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Allen v. Dayco Prods., Inc.*, 758 F.Supp. 630, 631 (D.Colo. 1990).

■ In reviewing a motion for summary judgment, the court must view the evidence in the light most favorable to the party opposing the motion. *Newport Steel Corp. v. Thompson*, 757 F.Supp. 1152, 1155 (D.Colo.1990). All doubts must be resolved

in favor of the existence of triable issues of fact. *Boren v. Southwestern Bell Tel. Co.*, 933 F.2d 891, 892 (10th Cir.1991); *Mountain Fuel Supply v. Reliance Ins. Co.*, 933 F.2d 882, 889 (10th Cir.1991).

In a motion for summary judgment, the moving party's initial burden is slight. In *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986), the Supreme Court held that the language of rule 56(c) does not require the moving party to show an absence of issues of material fact in order to be awarded summary judgment. Rule 56 does not require the movant to negate the opponent's claim. *Id.* at 323, 106 S.Ct. at 2552. The moving party must allege an absence of evidence to support the opposing party's case and identify supporting portions of the record. *Id.*

■■■ Once the movant has made an initial showing, the burden of going forward shifts to the opposing party. The nonmovant must establish that there are issues of material fact to be determined. *Id.* at 322–23, 106 S.Ct. at 2552–53. The nonmovant must go beyond the pleadings and designate specific facts showing genuine issues for trial on every element challenged by the motion. *Tillett v. Lujan*, 931 F.2d 636, 639 (10th Cir. 1991). Conclusory allegations will not establish issues of fact sufficient to defeat summary judgment. *McVay v. Western Plains Serv. Corp.*, 823 F.2d 1395, 1398 (10th Cir. 1987).

■■■ In reviewing the evidence submitted, the court should grant summary judgment only when there is clearly no issue of material fact remaining. In *Anderson*, 477 U.S. at 249–50, 106 S.Ct. at 2510–11, the Court held that summary judgment should be granted if the pretrial evidence is merely colorable or is not significantly probative. In *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), the Court held that summary judgment is appropriate when the trial judge can conclude that no reasonable trier of fact could find for the nonmovant on the basis of evidence presented in the motion and the response. *Id.* at 587, 106 S.Ct. at 1356.

## IV. Constitutionality

### A. Standard of Review

■■■ The Ordinance provides modest affirmative action for both women and racial minorities. While courts must apply intermediate scrutiny to gender-conscious legislative enactments, *see, e.g., Coral Construction v. King County*, 941 F.2d 910, 930–31 (9th Cir.1991), an ordinance surpasses or fails constitutional standards in light of the most stringent applicable level of scrutiny. In *Richmond v. J.A. Croson Co.*, 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989), the Supreme Court decided that all race-conscious classifications, including those that appear to be facially benign, are subject to strict scrutiny. 488 U.S. at 493, 109 S.Ct. at 721 (plurality); *id.* at 520, 109 S.Ct. at 735 (Scalia, J., concurring). Numerous circuit courts have similarly interpreted the majority and numerous concurring opinions within *Croson. See, e.g., O'Donnell*, 963 F.2d 420 (strict scrutiny applicable to 35% set-aside for minority contracts); *AGCC II*, 950 F.2d at 1412 (strict scrutiny used to "smoke out" illegitimate use of race); *Coral Construction*, 941 F.2d at 915–16 (racial classifications subject to strict scrutiny); *Cone Corp. v. Hillsborough County*, 908 F.2d 908, 913 (11th Cir.) (*"Hillsborough "*) ("When reviewing the constitutionality of [an MBE], courts apply strict scrutiny"), *cert. denied*, 498 U.S. 983, 111 S.Ct. 516, 112 L.Ed.2d 528; *Cunico*, 917 F.2d 431 (applying strict scrutiny to a minority preference against lay-offs). Because the most stringent level of scrutiny possible is that used in race-conscious remedial programs, we will analyze the Ordinance as if it set goals only for participation by racial minorities.

Denver argues that the cases calling for strict scrutiny do not control our decision on the constitutionality of the Ordinance. Unlike the ordinances and policies in all of the above cases, the Ordinance before us is not a "race-conscious classification." It is not a racial preference, quota, or even a variable set-aside; it is merely a vehicle to encourage nondiscrimination in the awarding of contracts. No minority or woman is preferred for a contract on the basis of being a minority or woman, rather, *all* prime contractors

are subject to the same *race-neutral* requirement that they show good faith efforts to solicit bids from subcontractors owned and controlled by minorities and women. It is not necessary that those good faith efforts succeed.

We note that the Ordinance as written and as put into effect creates only goals for minority participation, and lest it be said that 'goals' is used here euphemistically, we note that it is undisputed that the City and County of Denver sets goals in only a small portion of contracts and rarely reaches the goals it sets. Moreover, the goals are flexibly set in the first instance: in setting the goals, the OCC considers numerous factors not based upon race, gender, or even price. This is a new twist on the multitude of W/MBE programs that were created in the wake of *Croson.* There is a strong argument that because the Ordinance "merely sets goals and requires no action on the part of the City, [it] does not create any rights on the part of minority firms or any responsibilities owed those firms by the City [and that the goals] provision, on its face, therefore, does not trigger strict scrutiny, in contrast to the Richmond Plan considered in *Croson.*" *Contractors Association,* 945 F.2d at 1269 (Higginbotham, J., concurring).

The District Court for the Middle District of Pennsylvania similarly observed, in examining city policies almost identical, in relevant respects, to the Ordinance:

> [t]he policies do not require use of certain percentages of women and minorities but, rather, seek to ensure no *current discrimination.* The policies are screening devices as opposed to a classification based on whether prime contractors meet certain quotas for awards to minority and women contractors. Having taken the position that the policy statements create no quota or goal system, the court finds that strict scrutiny does not apply. Rather, the rational basis test applies.

*Associated Pennsylvania Constructors v. Jannetta,* 738 F.Supp. 891, 893 (M.D.Pa.1990) (emphasis in original).

The parties do not dispute that Concrete Works' rejected bids were appropriately deemed nonresponsive because they did not comply with the good faith criteria of the Ordinance. Concrete Works has not and cannot deny that it was refused certain contracts only because it failed to comply with the good faith requirement, and not because the ultimate winner was preferred on the basis of its race. In fact, under the Ordinance, nonminority contractors could lose contracts to other nonminority contractors solely because the winning contractors complied with the good faith requirements. Indeed, under the same facts, any entities not in compliance with the ordinance, even those qualifying as WBEs or MBEs, are deemed nonresponsive and accordingly denied the contract. The cause for Concrete Works' failure to be awarded the contracts, therefore, was its failure to comply with criteria which granted no benefit based upon racial preference (i.e., no affirmative action quota or set-aside), but rather *required only an accounting* of efforts made to solicit diverse participation. This accounting cannot be equated with a classification.

■ However, though we find these arguments persuasive and view the rational basis test as the appropriate standard of review, we feel compelled by *Croson* to apply strict scrutiny to all programs with even a remote racial affirmative action bent. It is clear that although the Ordinance requires only an accounting of good faith efforts, it does require that accounting only with regard to groups classified by race. We also refer, once again, to the ability, overstated by Concrete Works, of W/MBE prime contractors to use their own work in satisfying the City's goals. Although we believe that any affirmative action program which essentially forbids a beneficiary from accepting its benefits would be a meaningless program, it appears that by employing the "race-conscious" standard, the *Croson* Court meant for strict scrutiny to be applied to nearly all affirmative action. Strict scrutiny requires that a classification found to be based on race must serve a compelling state interest and must be narrowly tailored to further that interest. *Wygant v. Jackson Board of Education,* 476 U.S. 267, 274, 106 S.Ct. 1842, 1847, 90 L.Ed.2d 260 (1986).

## B. Compelling Interest

In *Croson*, the Supreme Court outlined the scope of discrimination that a race-conscious remedy could properly seek to redress. The Court held that governmental entities have a compelling interest in redressing both discrimination by the governmental entity and by private parties within the entity's legislative jurisdiction, so long as the municipality had somehow perpetuated the discrimination targeted by its program. *See* ,488 U.S. at 491–92, 109 S.Ct. at 720–21 (Rehnquist, C.J., White, J., O'Connor, J.); *id.* at 537–38, 109 S.Ct. at 744–45 (Brennan, J., Marshall, J., Blackmun, J.). In order to satisfy this requirement, it is enough for the City to show that it was a "passive participant" in the discrimination, rather than that it actively perpetrated such discrimination. *Id.* at 492, 109 S.Ct. at 721 (Rehnquist, C.J., White, J., O'Connor, J.); *Coalition,* 950 F.2d at 1413; *Coral Construction,* 941 F.2d at 916. In addition, the mere desire to prevent an infusion of tax dollars into a discriminatory industry may be sufficient to satisfy this requirement. *Croson,* 488 U.S. at 492, 109 S.Ct. at 721 ("It is beyond dispute that any public entity, state or federal, has a compelling interest in assuring that public dollars, drawn from the tax contributions of all citizens, do not serve to finance the ,evil of private prejudice.").

 In assessing whether a municipality's legislative body has established a compelling interest in a W/MBE plan, a court must examine the factual predicate justifying the necessity of such a plan. *Id.* at 500, 109 S.Ct. at 725. The adequacy. of the factual predicate is a question of law. *Associated General Contractors of Connecticut v. City of New Haven,* 791 F.Supp. 941 (D.Conn.1992). The predicate required for a race-conscious program is the existence of a systematic pattern of race-based exclusion in city construction. *Croson,* 488 U.S. at 509, 109 S.Ct. at 730. The municipality's findings must have provided it with a " 'strong basis in evidence for its conclusion that remedial action was necessary.' " *Id.* at 500, 109 S.Ct. at 725, *quoting Wygant,* 476 U.S. at 277, 106 S.Ct. at 1848 (plurality). However, the municipality need not "convinc[e] the court of its

liability for prior unlawful discrimination; nor does it mean that the court must make an actual finding of prior discrimination based on the [municipality's] proof before the [municipality's] affirmative action plan will be upheld." *Id.* at 292, 106 S.Ct. at 1856. Finally, while a municipality has the burden in establishing an adequate factual predicate, the burden then shifts to the challenging party to show that the evidence relied upon by the municipality will not support even an inference of discrimination.

### 1. Adequate Factual Predicate

In examining the factual predicate alleged by the City as the basis for the Ordinance, we begin by summarizing what sort and amount of evidence has been held insufficient. In *Croson,* the Court found unpersuasive the City of Richmond's mere recital of a remedial basis for its set-aside plan. *Id.,* 488 U.S. at 500, 109 S.Ct. at 725. It criticized as not probative Richmond's statement that discrimination existed in the construction industry generally, as opposed to Richmond specifically. *Id.* at 498, 109 S.Ct. at 724. It criticized as statistically flawed Richmond's assertion of a disparity between the percentage of contracts awarded to MBEs and the percentage of minorities in the city as a whole. *Id.* at 501–02, 109 S.Ct. at 725–26. And it rejected as lacking specificity the city's reliance on Congress' finding of discrimination in the national construction industry. *Id.* at 504, 109 S.Ct. at 727.

Likewise, the Circuit Court in *O'Donnell* agreed that the District of Columbia's "observation about society-wide discrimination, regardless of its truth," could not be relied on to enact a racial preference. The Court held "constitutionally meaningless" various statistically flawed statistics: the statistics lacked specificity, used an overly small sample size, covered only one year's worth of contracts, did not show discrimination in the District of Columbia's construction industry, and did not discern among qualified and unqualified MBEs. 963 F.2d at 425–26.

Finally, the District Court for the District of Connecticut held that sparse anecdotal evidence gathered by the City of New Haven was insufficient to establish a factual predi-

cate for its MBE set-aside. *New Haven*, 791 F.Supp. at 947. *See also International Bhd. of Teamsters v. U.S.*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977); *Coral Construction*, 941 F.2d at 919 ("anecdotal evidence may suffice to prove individual claims of discrimination [but] rarely, if ever, can such evidence show a systematic pattern of discrimination necessary for the adoption of an affirmative action plan"). In *New Haven*, the city came up with only fifteen anecdotal examples of discrimination, many of which had to do with employment discrimination generally, rather than discrimination in the construction industry in particular.

In determining that a factual predicate existed for racial discrimination in the relevant construction industry, the Denver City Council relied on a combination of statistical and anecdotal evidence, from general evidence in the late 1970s to more detailed findings in the years up to the present. The evidence goes far beyond the evidence found inadequate in *Croson*. It is a compilation of federal studies, anecdotal responses, independent analyses, city council hearings, census data, and statistical evidence on which any city council could reasonably rely to find a compelling governmental interest.

**General Evidence.** In 1977, Congress determined[4] that there was widespread discrimination in the national construction industry and in public contracting and that minority businesses were receiving less than 1% of the dollar amount of federally funded contracts. *See Fullilove v. Klutznick*, 448 U.S. 448, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980). In the same year, at Denver's Stapleton International Airport ("Stapleton"), minority businesses received 0% of the construction projects. No equivalent statistics were kept for women. Def. Mot. for Summ. J., Exh. E. In 1978, an investigation by the General Accounting Office revealed discrimi-

nation by Denver and the Department of Public Works. *Id.*, Exh. B, § V–1. In 1979, the Acting Director of Civil Rights for the Department of Transportation asserted that Denver was not in compliance with Title VI of the Civil Rights Act of 1964 and other federal laws and threatened to withhold federal financial assistance for Stapleton. *Id.*, Exh. F.

Beginning in the early 1980s, the evidence became more specifically focused upon Denver's own construction industry. In 1981, in the face of continuing federal pressure, the City began an administrative goals program for City-funded construction and design contracts at Stapleton.[5] The City Council then began investigating discrimination on City-funded construction projects. Only a fraction of the many studies, reports, and collections of anecdotal responses are summarized below.

**1981 Peat, Marwick, Mitchell & Co. Study.** In 1981, the City commissioned a study of the City's contracting procedures, including prequalification and allowed bid response time, and examined their impact on minority and nonminority construction companies. The authors of the study found that certain City procedures negatively affected the ability of minority construction companies to compete for City projects. The study rejected bonding requirements as potential barriers for minority businesses. *Id.*, Exh. B, § V–4.

**1979 Department of Public Works Major Bond Projects Report.** In 1979, a DPW report determined as virtually nonexistent the use of minority and woman owned businesses on City projects funded by City bonds in 1972, 1974, 1975, and 1976. The DPW report revealed an even greater statistical disparity in the use of minority and woman owned businesses on locally funded projects

---

4. We note that findings of discrimination in the Denver area, whether by Congress or by federal agencies, are not without probative value. First, *Croson* merely stated that cities could not rely on such evidence, not that it was without value. Second and most importantly, *Croson* did not forbid state and local legislators from relying on federal findings so long as such findings were *region-specific*. *See generally* Charlotte F. Westerhaus, *Resurrecting State and Local Race Con-*

*scious Set–Aside Programs*, 67 Ind.L.J. 169 (Winter 1991).

5. Prior to the federal government's intervention, minority-owned contractor utilization at Stapleton for the years 1977–1980 was 0%, 3.8%, .7%, and 2.1%, respectively. No figures were kept for woman-owned contractors until 1980, when the rate of utilization was .05%. *Id.*, Exh. E.

than on federally funded projects. *Id.,* pp. 5–7.

**1977 & 1982 U.S. Census Data on Size and Rate of Formation of W/MBEs.** U.S. Census Data for 1977 for firms with payrolls show that minority and women-owned construction firms had 57% of the average number of employees for all construction firms in the Denver MSA. W/MBEs averaged less than half the average gross receipts for all firms in that year. Analysis of the same statistics in 1982 yielded similar results. Other research found the rate of business formation for W/MBEs to be lower than for nonminority firms.

**1983 City Council Hearing.** On March 30, 1983, the City Council held a public hearing regarding such discrimination and the possible need for appropriate legislation. Of 21 citizens who commented on the need for legislation, an unspecified number of people spoke out in favor, providing examples of discrimination in city contracting, while an unknown number of persons spoke out against any such legislation. In May of the same year, the City enacted Ordinance No. 246, Series of 1983, to extend the Stapleton administrative goals program to projects outside of Stapleton. However, the program put in place by the 1983 ordinance still excluded from its scope all city departments other than DPW, and from 1986 to 1989 about one-third of all Denver construction dollars fell outside the scope of the goals program. *Id.,* pp. 4–5.

**1988 DPW and City Council Hearings.** In March 1988, DPW conducted numerous hearings on the effectiveness of the administrative goals program and the necessity of continuing it. While some individuals stated that discrimination in the Denver construction industry was nonexistent or less than the City alleged, others provided anecdotal evidence of racial and gender discrimination. The Acting Deputy Manager of DPW prepared a written report concluding the evidence submitted furnished a "clear indication" discriminatory practices persisted and the entire goals program should be continued. *Id.,* § V–8, § VI–6.

On June 13, 1988, the City Council held its own hearing regarding the enactment of a new ordinance. Following a hearing at which 49 citizens spoke, the City Council made extensive findings and enacted Ordinance 424, Series of 1988, later amended by Ordinance 213, Series of 1989. *Id.,* § V–10, § VI–10.

**Certification Applications.** After *Croson,* the City required that all W/MBEs submit a new application for certification as W/MBEs and that they include a statement of discrimination. Responses to the applications provide example after example of racist and sexist slurs and stereotypes, discrimination in solicitation and acceptance of bids, bid-shopping, and supplier relations. *Id.,* Exh. B, § VII–9 & App. D.[6]

**1990 Denver Disparity Study.** A study of discrimination prepared for the City and County of Denver examined all of the foregoing evidence and analyzed other information for the first time. For example, the study team investigated $180 million worth of general obligation bond fund projects and the extent to which W/MBEs participated in bond projects for which there were no goals. The study team determined the disparity ratios (utilization divided by capacity) for several bond projects, including bond pro-

6. One respondent reported being told by the presidents of two contracting companies not to use an Hispanic surname in the name of the firm because it "would reflect a stereotype that Hispanic people are lazy, slow and not concerned with quality of work or productivity." Another reported being asked, "What is a woman doing in this field?" A third was told by nonminority prime contractors that "where there were no Affirmative Action Goals ... they did not have to use us. They would only contact us on projects where the city had set a goal." A woman and her daughter are often told, "No thanks, sweetie, I need to talk to one of the guys." Contractors often call up and refuse to talk to the women and demand to talk to the older woman's son, who lives in California. One WBE reported that contractors had asked that the WBE remove women from the job site. Another reported hearing a man say there was not one qualified woman- or minority-owned surveying firm in the State of Colorado and that he resented giving up his fees to satisfy the participation goals. Many firms owned by women and minorities reported that their bids, even when low, received only cursory attention. Some report that their lowest bids were rejected without explanation.

jects for the period 1972–1976, a 1985 Museum of Natural History bond project, and 1985 housing bond projects.[7] In every case, for both WBEs and MBEs, the resulting disparity ratios were significantly less than 1.0, indicating that statistical disparities existed between W/MBE capacity and utilization. The study team concluded that majority contractors refused to contract with W/MBEs unless required to do so under a goals program, and that in the twelve months following the enactment of Ordinance No. 213, which relaxed MBE utilization requirements, there was a substantial decrease in MBE utilization.

The study team also interviewed 38 W/MBEs in the construction and professional design industries. The study team reported that while some of the persons contacted did not believe that they had been discriminated against, many others did, and cited specific anecdotal instances of discrimination.[8] The study team reported more anecdotal evidence of discrimination when it interviewed representatives from 31 firms of diverse composition and conducted "interviews with knowledgeable persons." After reviewing the compliance efforts of Denver's Affirmative Action Office, the study team concluded that private nonminority contractors and even some City officials have attempted to circumvent the affirmative action requirements. *Id.*, Exh. B, § VI & App. D–10. First, the study team investigated reports that a substantial number of construction and design contracts were not subject to the goals programs because they were improperly routed through the Department of General Services, which is not subject to the goals provisions and the team described the means by which the City's departments avoided the goals programs. Second, the study team noted evidence that nonminority contractors sometimes called WBEs the day before a bid was due, even though one day is not enough time

to prepare a bid, or called a defunct WBE, and then cited the calls as evidence of good faith.

The study team concluded that there was "strong evidence of discrimination against MBEs and WBEs in the construction industry." *Id.*, VIII–8. The team found substantial evidence of discrimination against Hispanics and also, in descending order of the amount of evidence, against blacks, Asians, and American Indians. The team concluded that the lesser number of examples for Asians and American Indians was attributable to the lesser number of firms owned by members of those groups and not to the existence of less discrimination. The team also concluded that the reason for any apparent overutilization of MBEs and WBEs was the result of the City's seven years of affirmative action goals programs; in order to control for the effects of the goals programs, the team examined pre-program evidence and concluded that in the absence of goals, the result was nearly zero W/MBE participation.

**Post–Enactment Evidence.** Denver has included with its motion for summary judgment and its reply some evidence of discrimination which became available only after enactment of the Ordinance, and other evidence of discrimination from the Denver Metropolitan Statistical Area ("Denver MSA") at large. The post-enactment evidence includes the 1991 Denver Disparity Study for Goods, Services, and Remodeling ("the 1991 DGS Study"), *Id.*, Exh. B–1, a summary of a 1992 report presented to the Regional Transportation District's Board of Directors ("the RTD study"), *Id.*, Exh. L., and a 1992 summary report by the U.S. Commission on Civil Rights ("Commission Report"), *Id.*, Exh. M.[9]

The 1991 Denver Disparity Study ("the DGS Study") conducted an exhaustive examination of ten major areas of procurement by

---

7. On the Museum and 1985 bond projects, both WBE and MBE utilization were well under two percent on every project. *Id.*, Exh. B, § VIII.

8. Some examples include a WBE owner who was told by the vice president of a company: "I have to warn you, my dad doesn't like working with women." She was informed by a male loan officer that his daughter, a secretary, made more

money than she. She reported comments from men in the local construction and design industries such as "How can a little gal like you handle this?" and "Where is your husband?"

9. Denver has not summarized or attempted to interpret the Commission Report and we decline to do so here.

Denver's Department of General Services ("DGS") and found them to be relatively free of the distorting effects of prior or current affirmative action efforts. The DGS Study examined an exhaustive body of quantitative and qualitative, or anecdotal, data. The authors of the study discovered that in 1989 and 1990, MBE disparity ratios for DGS remodeling projects were significantly less than unity, while the WBE ratio for 1989 was less than one and the ratio for 1990 greater than one. *Id.*, Exhs. B–1, VI–2 & N. The authors found statistically significant differences between W/MBEs and nonminority firms: DGS used disproportionately fewer W/MBEs than were available to handle City procurement; given the representation of minorities and women in skilled occupations—and thus in the pool of individuals most likely to form new businesses—the number of W/MBEs in the relevant industries was statistically lower than expected; W/MBEs were smaller in size than their nonminority competitors; and even controlling for employment size, W/MBE revenues were lower than the revenues of nonminority firms. *Id.*, Exh. B1, IV–4. The authors concluded that "[t]he study's findings included both quantitative and qualitative evidence sufficient to approach a prima facie case of discrimination against both MBEs and WBEs by the City itself and as a passive participant in discrimination practiced by private industry." *Id.*, Exh. B1, § IV–23.[10]

The RTD study examined utilization of W/MBEs in the Denver–Boulder MSA by the Regional Transportation District. The study's methodology included analysis of the geographic market from which RTD drew its contractors, U.S. Census data, relative utilization in the private sector, a public hearing, personal interviews, and a survey of over 350 local minority- and woman-owned construction firms. The authors calculated disparity ratios (utilization divided by availability) that indicated statistically significant disparities in the utilization of minority- and woman-owned construction firms, and the project director stated in an affidavit that such firms had, in his opinion, experienced discrimination in the Denver–Boulder MSA. *Id.*, Exh. L–2.

Initially, the parties disagree as to the nature of evidence that may be considered by either the Court or the jurisdiction enacting race-conscious remedial measures, including statistics taken from outside the City and County of Denver's jurisdiction, that is, from the six-county Denver Metropolitan Statistical Area ("MSA"), and evidence available only after enactment of the Ordinance.

### 2. *Extrajurisdictional Evidence of Discrimination*

Concrete Works argues that *Croson* forbids the City Council from using evidence of discrimination in adjoining counties outside its jurisdiction. *See Croson*, 488 U.S. at 509, 109 S.Ct. at 730 (noting that "[n]othing we say today precludes a state or local entity from taking action to rectify the effects of identified discrimination within its jurisdiction"). However, we are not able to agree with Concrete Works that statistical evidence from the Denver MSA is irrelevant or improperly considered. The concern of the Court in *Croson* was that cities not be able to share the data and findings of *Congress* and thus inappropriately use a vaguely defined "societal discrimination" as the factual predicate for MBE programs. *Croson*, 488 U.S. at 497, 109 S.Ct. at 723 (plurality) (observing that 'societal discrimination' is "an amorphous concept of injury that may be ageless in its reach into the past") (*quoting University of California Regents v. Bakke*, 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978)); *id.*, 488 U.S. at 526, 109 S.Ct. at 739 (Scalia, J., concurring). The Court has explained that evidence of discrimination should be specific so that race-conscious programs are designed to minimize burdens upon nonculpable third parties. *See United States v. Paradise*, 480 U.S. 149, 183, 107 S.Ct. 1053, 1072, 94 L.Ed.2d 203 (1987); *see also Coral Construction*, 941 F.2d at 917.

▮▮▮ It is clear that the use of evidence of discrimination from the Denver MSA impli-

---

10. The Court recognizes that the 1991 DGS Study does not cover the general contractor industry. It is, however, of some probative value because it tends to indicate discrimination by the same city agency that awards a large portion of general contractor contracts.

cates none of the concerns expressed by the *Croson* Court about an "amorphous" and malleable "societal discrimination." The study team found that over 80 percent of construction and design contracts awarded by the Denver Department of Public Works were awarded to contractors within the Denver MSA. Def. Mot. for Summ. J., Exh. B, at III–1. The evidence from the Denver MSA is relevant to the jurisdiction of Denver's contract awards, thus reducing the problem of innocent parties. In addition, the only industry data available for the Denver area has historically been data from the U.S. Census that addresses only the Denver MSA. The study team reasonably concluded that the relevant local construction industry was the Denver MSA. *See Associated General Contractors of California v. City and County of San Francisco*, 813 F.2d 922, 934 (9th Cir.1987) ("*AGCC I* ") (noting that any plan that extends race-conscious remedies beyond territorial boundaries must be based on very specific findings that actions the city has taken in the past have visited racial discrimination on such individuals).

Although Concrete Works cites *Coral Construction* for the proposition that "[t]o prevent overbreadth, the enacting jurisdiction should limit its factual inquiry to the presence of discrimination within its own boundaries," 941 F.2d at 917, Concrete Works ignores both the context in which the Court of Appeals made that statement as well as other relevant reasoning and holdings by the Court.[11] The Court rejected evidence from Pierce County, Washington because it concluded that not all Pierce County developers and contractors would seek business in both that county and the jurisdiction at issue, King County. At the same time, the Court concluded that evidence from other jurisdic-

tions *was* properly considered by the District Court. The Court of Appeals noted that the other jurisdictions were "either completely within or coterminous with the boundaries of King County. The data from these jurisdictions is, almost by definition, relevant to the question of discrimination within [King] County. Likewise, the risk of unfairly burdening innocent third parties is not present." *Id.* at 917. Concrete Works also overlooks the fact that the Court of Appeals found even the ultimately rejected Pierce County evidence to be probative, even though it was from a completely separate jurisdiction, because:

> It is, however, immediately adjacent to King County and is part of the same metropolitan area. Likewise, the world of contracting does not conform itself neatly to jurisdictional boundaries. In this regard, contracting differs markedly from a school system, which conducts its business in relative isolation from other school systems.

*Id.*

We conclude that Denver is not acting outside its jurisdiction, but is applying a policy to those contractors who have been found to choose to enter Denver's boundaries to seek work and win Denver's tax dollars.

### 3. *Post–Enactment Evidence*

■ Although we consider Denver's factual predicate sufficient without the post-enactment evidence, we will address Concrete Works objection to any evidence of discrimination which became available after the Ordinance was enacted.[12] Specifically, Concrete Works challenges the admissibility of the 1991 DGS Study, the RTD study, and

---

11. Plaintiff also admits that the Denver MSA is the relevant area from which to determine the availability of minority and women contractors, and its expert uses U.S. Census data for the Denver MSA *to establish availability of minority* and women contractors in Denver. Defendant correctly notes that it is unclear how Plaintiff can admit that the Denver MSA is the appropriate area from which to determine availability in the local industry, but not also utilization.

12. We note briefly the disingenuousness of Concrete Works' attack on the post-enactment evi-

dence when it also claims as a disputed issue of fact whether discrimination *currently* can be proven to exist or has been remedied by the ordinances in place since 1983. Brief of Plain. Resp. to Quest. of the Court, at 10; Plain. Brief in Opp. to Def. Mot. for Summ. J., at 19. Concrete Works cannot credibly maintain that Denver should be required prove the current existence of discrimination and at the same time attempt to bar the most current evidence on the matter.

the Commission Report. Concrete Works asserts that post-enactment evidence ought not to be considered because it is not possible to ensure that a program is remedial if the cause for the remedy is not discovered until after the remedy (here, the Ordinance) takes effect. However, it would make little sense to strike down the Ordinance *solely* because the evidence of discrimination before the City Council was insufficient without the post-enactment evidence only to watch the City Council reconvene immediately, incorporate the new evidence into a new ordinance, and arrive at a constitutionally adequate factual predicate. Practically speaking, this Court is being asked to determine the constitutionality of an Ordinance as it exists now, not an ordinance as it existed in September of 1990. The nexus between causation (i.e., discrimination) and remedy (i.e., the Ordinance) is most logically evaluated in light of the respective known causation and remedy as they exist at the time the nexus is challenged. Although Concrete Works' concern has considerable merit, we conclude that it makes little sense and would be highly impractical not to consider all of the available evidence on discrimination.[13] *See Coral Construction,* 941 F.2d at 920.

Such a rule recognizes the seemingly conflicting demands sometimes placed upon a state or municipality by the Constitution. *Id.* The state "has the power to eradicate racial discrimination and its effects in both the public and private sectors, and the absolute duty to do so where those wrongs were caused intentionally by the State itself." *Croson,* 488 U.S. at 518, 109 S.Ct. at 735 (Kennedy, J., concurring); *Coral Construction,* 941 F.2d at 920. Because of that absolute duty:

[a] state or municipality, when presented with evidence of its own culpability in fostering or furthering race discrimination,

might well be remiss if it failed to act upon such evidence. Thus, a municipality having such evidence would face the dilemma of deciding whether to wait the months necessary for further development of the record, risking constitutional culpability due to its inaction, or to act and to risk liability for acting prematurely but otherwise justifiably.

*Id.* at 921.

While subsequent evidence may well fail to support the need for a remedial program, we cannot strike down an ordinance that a municipality enacts under the good faith belief that it has systematically discriminated in a local industry. The Ordinance cannot be invalidated now solely because it may not have met constitutional standards at the time of its enactment.[14]

### 4. Evaluation of the Factual Predicate

■ In any analysis of disparity, statisticians compare at least two bodies of data. The primary disagreement that Concrete Works has with Denver is over the propriety of the data used in the two disparity studies. Concrete Works alleges that Denver has overstated disparity by defining the local construction industry as all construction in the Denver MSA as well as by using the 'availability' of W/MBEs rather than 'capacity'.

Concrete Works' arguments and contrary data point up the danger of the courts attempting to discern whose statistics are 'more accurate' or better interpreted and, further, regardless of the disputed validity of the statistics, whether a legislative body nevertheless believed it had a strong basis—strong enough to survive strict scrutiny—for enacting a goals policy to assist minorities and women in the construction industry. Concrete Works points out that the evidence

---

13. By stating that all available evidence of discrimination should be examined in order to decide the constitutionality of a remedial ordinance, we do not mean to suggest that future plaintiffs have either standing or legitimate arguments to challenge ordinances on the basis that the identified discrimination has allegedly been remedied since enactment. The courts have no power in a scheme of separation of powers to strike down the sunset provisions of constitution-

al ordinances and replace them with earlier expiration dates based on the Court's view of whether discrimination has been remedied.

14. For all of the reasons stated above, we also reject Plaintiff's contention that the Court should not consider evidence existing prior to Defendant's motion for summary judgment but not adduced until its reply.

contained in the 1990 Disparity Study "proves" there was no statistical disparity in the use of minority and woman owned businesses in *Denver public contracting*. Defining the relevant local construction industry as the industry created solely by DPW contracts, Concrete Works illustrates that W/MBEs were utilized *by DPW* at rates well above their capacities. Concrete Works bases its critique of the bond projects disparities on similar grounds.

But it cannot be doubted that a state or municipality "has the authority to eradicate the effects of *private* discrimination within its own legislative jurisdiction." *See Croson,* 488 U.S. at 491–92, 109 S.Ct. at 720–21 (plurality) (emphasis added); *compare id.* at 518, 109 S.Ct. at 734 (Kennedy, J., concurring) (noting that municipality "has the power to eradicate racial discrimination and its effects in both the public and private sectors"); *Coral Construction,* 941 F.2d at 920; *and AGCC I,* 813 F.2d at 929 *with Croson,* 488 U.S. at 524, 109 S.Ct. at 738 (Scalia, J., concurring) (race-conscious remedies should be allowed only where necessary to "eliminate [its] own maintenance of a system of unlawful racial classification"). We find no merit in the implication—refuted by decades of affirmative action policies nationwide and at every level of government—that a governmental body can attempt to abolish discrimination only from within its own ranks while the same discrimination survives unchecked in the private sector. Concrete Works also ignores the influence of affirmative action even in the utilization of W/MBEs by Denver; Denver not only established statistically that DPW and DGS discriminated against W/MBEs in the absence of goals, but has also pointed out that the existence of its affirmative action programs since the early 1980s must be expected to inflate artificially any disparity ratio near to or above unity.

Concrete Works next criticizes the use of "availability" data, rather than data on W/MBE capacity, in the City's calculation of disparity ratios. A *disparity ratio* is calculated by comparing the capacity of W/MBEs to their utilization in the industry. *Capacity,* as Concrete Works' expert economist points out, is ideally measured by the total amount of business that could be handled by MBEs. There are typically three measures used to predict the amount of business that W/MBEs can handle: the number of W/MBE companies relative to the total number in the industry (also known as 'availability'), W/MBE revenue as a percent of industry revenue, and the number of W/MBE employees as a percent of the industry total. *Utilization* is calculated by comparing the ratio of industry contracts received by MBEs relative to the total number of contracts in the industry. A utilization/capacity ratio of less than one, or unity, implies evidence of discrimination against minority-owned firms. If the disparity is determined to be statistically significant (that is, the ratio differs from unity, the expected mean, by two or more standard deviations), the result is a strong inference of discrimination not attributable to factors other than race or gender. "In cases in which the Standard Deviation Quotient is rather high, it is unlikely that factors such as lack of bonding or experience alone account for such a large disparity." Daron S. Fitch, *The Aftermath of Croson: A Blueprint for a Constitutionally Permissible Minority Set–Aside Program,* 53 Ohio St.L.J. 555 (1992) (also recommending municipalities employ chi-square and multiple regression analyses in addition to standard deviation calculations).

■ Concrete Works argues that capacity, or the ability to handle business, is the appropriate measure of comparison, rather than availability, or the number of available firms. There are several problems with this argument. First, as evidenced both by Concrete Works' failure to suggest an alternative way to measure capacity and the admission of its expert that availability is more often used in actual practice, the ability of a firm to handle any given amount of business is exceedingly difficult to define and even more difficult to quantify. Capacity is a function of many subjective, variable factors. Second, while one might assume size reflects capacity, it does not follow that smaller firms have less capacity; most firms have the ability and desire to expand to meet demand. A firm's ability to break up a contract and subcontract its parts makes capacity virtually meaningless. Furthermore, Concrete Works does not dispute that the Denver construction

market is characterized by relatively small firms and that size is therefore of even less significance. Third, to the extent that capacity can be measured, Denver did analyze statistics using all three methods—number of firms, revenue, and number of employees. Disparities existed in the proportion of W/MBE firms receiving contracts as well as in relative revenues corrected for the relatively smaller average number of W/MBE employees.[15]

Finally, Concrete Works can cite no authority for its assertion that its amorphous, ambiguous conception of capacity is required. No court to date has required a comparison of a firm's 'ability to handle work.' Cf. *Wygant*, 476 U.S. at 267, 294, 106 S.Ct. at 1842, 1857 (when the "availability of minorities in the relevant labor pool substantially exceed[s] those hired ... one may draw an inference of deliberate discrimination"); *AGCC II*, 950 F.2d at 1414 (disparity between the percentage of contracts awarded to MBEs and the percentage of available MBEs is "an invaluable tool" in demonstrating discrimination); *Hillsborough*, 908 F.2d at 913 (same). Concrete Works points us to the statement in *Croson* that "where special qualifications are necessary, the relevant statistical pool for purposes of demonstrating discriminatory exclusion must be the number of minorities qualified to undertake the particular task." 488 U.S. at 501–02, 109 S.Ct. at 726. The next paragraph of the plurality's opinion, however, approvingly makes an example of *Ohio Contractors Assn. v. Keip*, 713 F.2d 167, 171 (1983), which the Court notes upheld a minority set-aside based on "the percentage of minority *businesses* in the State compared to [the] percentage of state purchasing contracts awarded to minority firms upholding [the] set-aside." *Croson*, 488 U.S. at 502, 109 S.Ct. at 726 (emphasis in original).[16]

The Court's approval of methodology employing the number of firms (availability) compared to the number of contracts they receive is consistent with the logic of making out prima facie cases of individual discrimination in Title VII cases: if a sufficiently large pool of minority carpenters is systematically excluded from employment at a rate higher than chance would allow, i.e., at a statistically significant rate, then statistics allow us to isolate race as a potentially strong factor in explaining discrimination against even one individual. Moreover, in Title VII cases, a party challenging evidence of discrimination must have conducted its *own* regression analysis to show that the evidence is in fact flawed, and that correcting for any alleged flaws would have resulted in no disparities. *Allen v. Seidman,* 881 F.2d 375 (7th Cir. 1989); *Sobel v. Yeshiva University,* 839 F.2d 18, 34 (2d Cir.1988) (party challenging validity of multiple regression analysis must make showing that factors it contends ought to have been included would weaken the evidence of disparity); *Palmer v. Schultz,* 815 F.2d 84, 101 (D.C.Cir.1987) (party cannot in most cases rebut statistical evidence without introducing evidence to support contention

15. The statistics bear out what may be expected in an historically discriminatory industry. Under what has been termed the "intertemporal" approach to discrimination, "any act of discrimination continues to affect its victim's productivity beyond the time when the act ceased. As long as Blacks' productivity is lower than that of whites, employers will prefer whites. Hence in any market where discrimination was prevalent in the past, current racial disparities might be explained in terms of that discrimination." Martin J. Katz, *The Economics of Discrimination: The Three Fallacies of Croson,* 100 Yale L.J. 1033 (Jan.1991). Although it might appear that a minority contractor's size and productivity will eventually catch up to the nonminority's when the discriminatory acts cease, the time value of money effectively prevents such catching up. *Id.*

16. Even the *Croson* Court's criticism of Richmond's statistics comparing minority contractor participation with Richmond's minority population at large is not invulnerable. The Court explained that the "dearth of minority participation" in Richmond's construction industry could have resulted from differing "black and white career entrepreneurial choices." 488 U.S. at 503, 109 S.Ct. at 727. But as one commentator argues, if a lucrative market such as construction is truly competitive, "such choices could only be explained in one of two ways. Either Blacks must be less rational than whites ... or their incentives must differ from those of whites." Because the former option would be both racist and without evidentiary basis and the latter begs the question of why the incentives differ, *Croson*'s critique may deserve re-examination. *See* Katz, *Economics of Discrimination, supra.*

that missing variable can explain away disparities); *Catlett v. Missouri Highway and Transp. Comm'n.*, 828 F.2d 1260 (8th Cir. 1987), *cert. denied*, 485 U.S. 1021, 108 S.Ct. 1574, 99 L.Ed.2d 889 (1988); *Segar v. Smith*, 738 F.2d 1249, 1287 (D.C.Cir.1984); *Chicago Fire Fighters v. Washington*, 736 F.Supp. 923 (N.D.Ill.1990); *see also* D. Baldus & J. Cole, *Statistical Proof of Discrimination*, vii (1987 Supp.) (when statistical evidence is challenged on methodological grounds, the burden should be on the challenger to present evidence that the statistics are defective and how the defect biases the results). Concrete Works has criticized portions of Denver's methodology without showing that its alleged flaws would have made a difference in the disparity ratios. It would be unfair to allow disgruntled plaintiffs to drag affirmatively acting municipalities into court on such meager rebuttal evidence.

Concrete Works also challenges Denver's interpretation of the evidence showing that minority- and women-owned firms are on average smaller and have a lower rate of formation. This disagreement once again illustrates the difficulty of haggling over statistics. We agree with Concrete Works that this evidence is not necessarily proof of discrimination in the construction industry, and that it may also be the result of the relatively short period of time W/MBEs have been in the industry, difficulties in obtaining capital, credit, and insurance, and bonding requirements. On the other hand, while Concrete Works criticizes the business formation findings on the basis that W/MBE formation actually increased 180% during the period from 1977 to 1982, it ignores key facts. First, W/MBEs saw their revenues increase by only 95% while nonminority firms' revenue increased by 150%; second, total representation of minorities and women in the industry is still below their representation in the community; and third, once started up, W/MBE growth is still much slower and the rate of failure much higher than among nonminority firms. In fact, the disparities between W/MBE and nonminority firm revenues and employees are *higher* than the disparities calculated by using the number of firms. Def. Mot. for Summ. J., Exh. B, App. C–8.

It appears from Concrete Works' critiques of Denver's interpretation of the statistics and anecdotal evidence that Concrete Works would require a municipality affirmatively to *prove* discrimination with such a degree of statistical certainty that no statistician could disagree. We do not believe that *Croson* requires such an onerous, perhaps impossible, burden of proof. The municipality's findings must have provided it with a " 'strong basis in evidence for its conclusion that remedial action was necessary.' " *Croson*, 488 U.S. at 500, 109 S.Ct. at 725, *quoting Wygant*, 476 U.S. at 277, 106 S.Ct. at 1848. The municipality need not "convinc[e] the court of its liability for prior unlawful discrimination"; nor must the court "make an actual finding of prior discrimination based on the [municipality's] proof before the [municipality's] affirmative action plan will be upheld." *Id.* at 292, 106 S.Ct. at 1856. The municipality must 'merely' cite findings "approaching a prima facie case of a constitutional or statutory violation." *Croson*, 488 U.S. at 500, 109 S.Ct. at 725. Concrete Works' citation to *Coral Construction* as authority that it should be allowed to refute Denver's statistics in district court is inapposite. In *Coral Construction*, the Court allowed Plaintiff to rebut post-enactment statistical evidence of discrimination submitted by the County only days before a hearing on summary judgment in the district court, but rebuttal in district court was necessary only because the Court ruled King County to have an insufficient factual predicate absent the new evidence. 941 F.2d at 921. In the case at bar, we believe that Denver's pre-enactment evidence constitutes a sufficient factual predicate and that Concrete Works has failed to bear its burden of attacking that evidence as it must—*on summary judgment and before trial*—in a meaningful way.

No municipality can avoid honest differences in the interpretation of its statistical evidence of discrimination. Although Concrete Works is able to say that disagreements exist (and would have the Court deny summary judgment on that basis), those disagreements can be resolved as a matter of law. We do not believe strict scrutiny allows a court to completely substitute its own judg-

ment for a legislature's reasonable belief that it has a "strong basis in the evidence." In any event, we believe that the large, exhaustive body of evidence adduced by Denver would more than outweigh the force even of Concrete Works' potentially legitimate criticisms. Denver has presented the Court with numerous statistical and anecdotal findings of discrimination from the late 1970s to the present, including: the 1978 GAO report; the 1979 DPW report; the 1981 Peat, Marwick study; the 1983 City Council hearing and findings; the 1988 DPW hearings and report; the 1988 City Council hearing and findings; certification applications submitted under the 1989 amendment; answers to the City's 1988 questionnaire regarding discrimination in the local construction industry; the 1990 Disparity Study; the 1991 Disparity Study; and the 1992 RTD study.

Denver's Ordinance suffers from none of the defects that doomed the plans in *Croson* and *O'Donnell,* 963 F.2d at 425–26 (finding statistics lacked specificity, used an overly small sample size, covered only one year's worth of contracts, did not show discrimination in the relevant construction industry, and did not discern among qualified and unqualified MBEs). The evidence of discrimination on which it is based quantitatively and qualitatively allows of a reasonable inference of discrimination in the awarding of contracts in Denver's construction industry. We therefore find that Denver had an adequate factual predicate for its finding that discrimination existed in the local construction industry. We further find that Denver's interpretation of its factual predicate survives strict scrutiny.

## C. Narrow Tailoring

In order to survive strict scrutiny, any race-conscious remedy must also be narrowly tailored to redress the consequences of discrimination. *Croson,* 488 U.S. at 507–08, 109 S.Ct. at 729. Courts have isolated three characteristics identified by *Croson* as indicative of narrow tailoring. *See, e.g., AGCC II,* 950 F.2d at 1416; *Coral Construction,* 941 F.2d at 922; *Cone Corp.,* 908 F.2d at 916–17. First, a W/MBE program should be instituted either after, or in

conjunction with, race neutral means of increasing minority business participation in public contracting. *Croson,* 488 U.S. at 507, 109 S.Ct. at 729. Second, the plan should avoid the use of rigid numerical quotas. *Id.* at 507–08, 109 S.Ct. at 729–30. Third, "an MBE program must be limited in its scope to the boundaries of the enacting jurisdiction." *Id.* at 491–92, 109 S.Ct. at 720–21.

### 1. Race– and Gender–Neutral Means

Concrete Works does not dispute that Denver enacted the Ordinance after or in conjunction with race-neutral means of increasing W/MBE participation in public contracting. Indeed, prior to enacting the Ordinance, Denver had already considered eliminating prequalification requirements and breaking down projects to facilitate small business participation, and had implemented bond guarantee programs, a prompt payment ordinance, a contractor mentor program, and a pre-apprenticeship program. Denver, Co., Rev.Mun.Code ch. 28, art. III, div. 3, § 28–52(a)(4). *Cf. Croson,* 488 U.S. at 507, 109 S.Ct. at 729 (noting that "there does not appear to have been any consideration of the use of race-neutral means to increase minority business participation in city contracting"). The City determined that some race-neutral measures were not available to it: payment and performance bonds were required by state law to be maintained on a majority of City construction contracts; under Denver's charter construction contracts must be awarded to the lowest responsive bidder; and all contractors must pay the prevailing wage. Further, in conjunction with the race-conscious portion of the Ordinance, the City still provides for numerous neutral good faith requirements, improved instructional resources for inexperienced contractors, and city and contractor information outreach. *Id.* Strict scrutiny requires only good faith, not exhaustion of all alternatives. *AGCC II,* 950 F.2d at 1417; *Coral Construction,* 941 F.2d at 922.

### 2. Waiver and Flexibility

We next examine the Ordinance for flexibility and opportunities for waiver. It is clear the Ordinance does not contain any-

thing approximating a "rigid numerical quota." *Cf. Croson*, 488 U.S. at 508, 109 S.Ct. at 729 (noting that 30% set-aside was narrowly tailored to no goal but outright racial balancing). The goals provisions create goals systems that are best characterized not as the quotas or set-asides Concrete Works insists they are, but rather as *flexible aspirational goals*. The first level of analysis of the goals provisions should note that no one is required to meet any specific goal set by the City. All contractors have open to them the route of good faith compliance.

The second level of analysis asks the methodology used in setting the goals. The Ordinance indicates that the goals are set on a project-by-project basis. The *Croson* Court suggested that plans with waivers permitting case-by-case consideration presented fewer or no constitutional problems. *Croson*, 488 U.S. at 507–08, 109 S.Ct. at 729–30. Under the Ordinance, three goals committees, all with membership apportioned among experienced non-minorities, minorities, and women, advise the OCC Director in setting goals. Individual project goals may range from the 0% goal set on 24% of all 1991 projects to a figure that may be larger than the annual goal.

The third level of analysis includes how the goals are actually implemented. As we have noted, the goals are rarely met—in 1991, goals were met on only 63% of contracts and overall utilization for MBEs and WBEs was 76% and 50%, respectively, of the annual goal set. We see this as clear evidence that the flexible aspirational goals are in fact just

that, and no quota can be said to exist. *Compare O'Donnell*, 963 F.2d at 423 (observing that percentage goal "became far more than merely a hope, a wish or an aspiration" because ordinance stated municipality "shall" allocate a certain percentage of construction contracts) *with Hillsborough*, 908 F.2d at 917 (approvingly noting goal of 25% was flexible because municipality's "working goal" was only 19% and was not applicable to every project) *and* Ordinance, § 28–55 ("the Director *may* establish ... annual remedial goals of sixteen (16) ... and twelve (12) per cent ...") (emphasis added).

In the fourth level of analysis, in order not to be deemed overly rigid, a goals plan should remedy only specified discrimination. Concrete Works complains that Denver has indiscriminately "lump[ed] ethnic groups together" for the purpose of determining whether their members have suffered from discrimination. Implicit in Concrete Works' criticism is an objection to the rebuttable presumption the Ordinance grants all W/MBE applicants. Concrete Works claims that of 372 approved W/MBE applications there are over 100 containing admissions that the applicants did not believe themselves to have suffered discrimination.[17] Concrete Works appears to assume that it is possible for minority contractors always to be aware whether they have been excluded from consideration or treated differently. There is no basis for imputing such knowledge. Indeed, a statistical study of the pattern of contract awards in an entire industry is precisely the

**17.** We note that at the same time Concrete Works excoriates the validity and reliability of anecdotal evidence, it accords virtually dispositive weight to the anecdotal representations of certain minority contractors who claimed not to have suffered discrimination. The anecdotal representations of the minority contractors may or may not be accurate; it is to provide foundation for such testimony that we look to statistical evidence, and whatever minority contractors may believe or claim to believe, the statistical evidence shows racial disparities among firms in contract awards, revenues, and number of employees.

We further note that a requirement of proving the need for individual remedies would resolve only the symptom and not the problem of pervasive, often unconscious discrimination. Those who had not suffered discrimination or claim not

to have suffered discrimination would have no guarantee barring future discrimination against them. Such a requirement would also logically require inquiry into whether particular nonminority firms had ever personally benefitted from discrimination. *Croson* does not mandate such onerous and even irrelevant considerations. Once a municipality finds a strong statistical and anecdotal basis for its belief that discrimination exists, it must be allowed to presume that discrimination may not only be intentional but may be aversive, or unconscious and unintentional; that most minorities in the area have suffered such discrimination, especially where their firms are disproportionately small or lacking in revenues; and that only a system-wide, generally applicable response will alleviate the problem and allow minorities to "catch up" to level of performance created by white advantage.

mechanism to disprove such illogic. It is also conceivable that at least some number of minorities claimed not to have suffered discrimination because they feared retaliation, stigmatization, the presumption that they received benefits due only to their race, or any of the other negative effects of affirmative action.

In *AGCC II,* the District Court reasoned that:

> an iron clad requirement limiting any remedy to individuals personally proven to have suffered prior discrimination would render any race conscious remedy superfluous. For such a remedy could only be applied solely on the basis of the beneficiary's status as a 'past victim' and without reference to any racial classification at all.

748 F.Supp. 1443, 1455 (N.D.Cal.1990). The *Croson* Court did not eliminate racial classifications altogether. 488 U.S. at 509, 109 S.Ct. at 730 (plurality) (noting that "in the extreme case, some form of narrowly tailored racial preference might be necessary to break down patterns of deliberate exclusion"); *id.* at 511, 109 S.Ct. at 731 (Stevens, J., concurring) (observing that government decisions resting on racial classifications are in some cases permissible); *id.* at 519, 109 S.Ct. at 735 (Kennedy, J., concurring) (refusing to adopt automatic rule against racial preferences). The City is not required to make a "finding of specific instances of discriminatory exclusion for each MBE ... [I]f systemic discrimination in the County is shown, then it is fair to presume that an MBE was victimized by the discrimination." *Coral Construction,* 941 F.2d at 925; *see also Wygant,* 476 U.S. at 287, 106 S.Ct. at 1854 (noting that an affirmative action plan "need not be limited to the remedying of specific instances of identified discrimination for it to be deemed sufficiently 'narrowly tailored.' "); *AGCC II,* 950 F.2d at 1417 n. 12. We note further that the presumption of discrimination is rebuttable; the W/MBE certification is subject to a revenue cap above which a minority- or woman-owned business 'graduates' from the aspirational goals measures, losing not only the presumption but any ability to be certified a W/MBE; and the Ordinance, limited to five years' duration, is scheduled to expire on August 31, 1995.

Concrete Works' second objection is that no pattern of discrimination was shown for every racial group. This is not the case. The disparity studies, among other evidence, clearly show disparities for all four racial minorities referred to in the Ordinance. *Compare Croson,* 488 U.S. at 506, 109 S.Ct. at 728 (noting that the gross overinclusiveness of Richmond's racial preference—which includes Aleut and Eskimo citizens—"strongly impugns the city's claim of remedial motivation") *and O'Donnell,* 963 F.2d at 427 (noting that municipality made no findings of discrimination against Hispanics, Asian Americans, Pacific Islanders or Native Americans) *with Hillsborough,* 908 F.2d at 917 (observing as evidence of narrow tailoring fact that ordinance grants only 1% goal to groups not widely discriminated against in Hillsborough County, Florida, such as Eskimos, Asian Americans, and Native Americans) *and AGCC II,* 748 F.Supp. at 1454 (approving limitation of ordinance to groups evidence shows were discriminated against). While the statistics of disparity for American Indians and Asian–Americans admittedly carry less statistical significance, the reason for that lesser significance is the small sample size of contractors from those groups. Were we to forbid the City to infer discrimination against these groups simply because the number of their contractors is so small, we would be engaging in a circular argument: discrimination against these groups may not be remedied because discrimination, among other things, has kept their numbers so small that discrimination cannot be proven with airtight statistical significance. The statistics which do exist on these groups show disparity, and for the foregoing reasons we do not believe the Court may deny the City's inference that these groups also suffer from discrimination.

Examples of waiver and alternative routes of compliance in the Ordinance read like a how-to manual on narrowly tailored aspirational goals ordinances. Prime contractors need only award a bid to a W/MBE if the W/MBE is the lowest qualified bidder, Ordinance, § 28–58(9), where "qualified" means that the W/MBE has "the financial ability,

skill, experience and access to the necessary staff, facilities and equipment" to perform the work. *Id.,* § 28–54. So that minorities and women do not incorporate contracting companies simply to take advantage of the Ordinance, a W/MBE must have engaged in sustained business activity in the construction business for at least three months. *Id.,* § 28–73(3). The prime contractor is allowed to show why a W/MBE should not be awarded a contract despite being the lowest bidder, and may consider nonmonetary factors such as the prime's past experience with a certain subcontractor. *Id.,* §§ 28–54, 28–58. Goals are set only where there are qualified MBEs available. Good faith efforts to secure minority participation provide a waiver to meeting the goals. A contractor certified as both a WBE and an MBE may count its own work toward fulfillment of the goals only once, and not in fulfillment of both the WBE and MBE goals. *Id.,* § 28–57(1). Non-minority prime contractors may count the work of W/MBE contractors in satisfaction of the requirements through both subcontracting and joint ventures. *See AGCC II,* 950 F.2d at 1418 (approving possibility of joint ventures as evidence of narrow tailoring). The Ordinance allows prime contractors to resubmit information or to clarify their original good faith efforts, *id.,* § 28–59, and to make administrative appeals of the City's decisions, *id.,* § 28–33. *See AGCC II,* 748 F.Supp. at 1454 (approving possibility of administrative appeals as evidence of narrow tailoring). The Ordinance provides for annual review of its efficacy, capacity and utilization calculations, and the level of its goals. Ordinance, § 28–55. It is limited only to smaller W/MBEs under the presumption that firms attaining over a certain level of annual gross receipts have overcome the effects of discrimination and should be graduated from the program. *See AGCC II,* 950 F.2d at 1417 (approving of graduation requirement because it avoids windfalls to MBEs that have overcome discrimination); *Hillsborough,* 908 F.2d at 917 (same). It is not applicable to any contracts for which any part of the contract price is paid by the federal government. Ordinance, § 28–79. It is not of unlimited duration, but rather is scheduled to expire on August 31, 1995. *See AGCC II,* 748 F.Supp.

at 1454 (approving limited duration of ordinance as evidence of narrow tailoring). Denver's aspirational goals ordinance is even more modest than the "modest" bid preferences approved by other courts. *See, e.g., AGCC II,* 748 F.Supp. at 1453.

### 3. Remedies Addressing the Enacting Jurisdiction

The final criterion established by *Croson* and its progeny is that a race-conscious remedy be limited to eradicating discrimination within the boundaries of the enacting jurisdiction. There can be no doubt that although Denver gathered evidence of discrimination by contractors based in cities adjoining Denver County, the Ordinance itself applies only to contracts awarded by the City and County of Denver for work within the City and County of Denver by contractors within the Denver MSA.

Similarly, although minorities from outside the state of Colorado appear to be eligible for W/MBE status, they too must either attest to City-sponsored discrimination or show that they have attempted to work in the Denver MSA in the period prior to the Ordinance, that is, the period during which Denver inferred the existence of discrimination. We note *Croson's* criticism of the "gross overinclusiveness" of Richmond's provision of remedial relief to an Aleut citizen who "moves to Richmond tomorrow." 488 U.S. at 506, 109 S.Ct. at 728. However, unlike Richmond's, Denver's ordinance confers no remedial benefits on members of groups which have not suffered past discrimination in the Denver market. Racial groups not represented in Denver may not avail themselves of the Ordinance and neither may individuals even of the protected groups who nevertheless have never attempted to do business in Denver. Moreover, if Denver tried to limit the remedy for its own discrimination to contractors based on residence, it would face even more serious constitutional challenges from contractors who allege discrimination by Denver but have been excluded from the remedy.

### 4. Conclusion

We are satisfied that the Ordinance is narrowly tailored; indeed, if it were not, then

we have grave doubts about whether *any* ordinance could pass scrutiny under so exceptionally strict a test. Although the Ordinance is assuredly not perfect, we doubt that any ordinance could achieve perfection in both process and result. The ordinance is a constitutional permissible exercise of the legislative power by Denver. It is not constitutionally infirm in any respect. There are no genuine issues of material fact and the Defendant is entitled to judgment as a matter of law.

### V.

Accordingly, it is ordered that:

(1) Defendant's Motion for Summary Judgment, filed September 29, 1992, is GRANTED. The Clerk of the Court is DIRECTED to enter judgment in favor of Defendant, The City and County of Denver, Colorado, a municipal corporation and against Plaintiff, Concrete Works of Colorado, Inc., a Colorado corporation.

(2) Plaintiff's Objection to Evidence Submitted with the Reply Brief of Denver in Support of Its Motion for Summary Judgment, filed November 6, 1992, is OVERRULED.

(3) All parties to bear their own costs.