## CONCRETE WORKS OF COLORADO, INC., a Colorado corporation, Plaintiff–Appellant,

v.

## DENVER, CITY AND COUNTY OF, a municipal corporation, Defendant– Appellee,

Associated General Contractors of America, Inc.; Colorado Building Industry Coalition; and Hispanic Contractors of Colorado, Amici Curiae.

No. 93–1095.

United States Court of Appeals, Tenth Circuit.

Sept. 23, 1994.

Rehearing Denied Oct. 17, 1994.

Todd S. Welch of Mountain States Legal Foundation, Denver, CO (William Perry Pendley and John G. Nelson, with him on the brief), for plaintiff-appellant.

Angelina Irizarry of Irizarry & McCall, Denver, CO (Raymond D. McCall of Irizarry & McCall, and Daniel E. Muse, John R. Gross, Norman R. Bangeman, and Victoria Ortega of Denver City Attorney's Office, with her on the brief), for defendant-appellee.

* The Honorable Byron R. White, Associate Justice of the United States Supreme Court, (Ret.), sitting by designation, pursuant to 28 U.S.C. § 294(a).

Wm. Bradford Reynolds of Dickstein, Shapiro & Morin, Washington, DC, for amicus curiae Associated General Contractors of America, Inc.

Michael J. Glade of Inman Flynn & Biesterfeld, P.C., Denver, CO, for amicus curiae Colorado Bldg. Industry Coalition (Hispanic Contractors of Colorado also join in this Brief).

Before WHITE, Associate Justice (Ret.),* LOGAN and EBEL, Circuit Judges.

EBEL, Circuit Judge.

In this appeal, we consider whether the City and County of Denver's race- and gender-conscious public contract award program complies with the Fourteenth Amendment's guarantee of equal protection of the laws. Plaintiff–Appellant Concrete Works of Colorado, Inc. ("Concrete Works") appeals the district court's summary judgment order upholding the constitutionality of Denver's public contract program. We conclude that genuine issues of material fact exist with regard to the evidentiary support that Denver presents to demonstrate that its program satisfies the requirements of *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989). Accordingly, we reverse and remand.

## I. Background

On September 4, 1990, the Denver City Council enacted Ordinance No. 513 ("Ordinance") to enable certified racial minority business enterprises ("MBEs")[1] and women-owned business enterprises ("WBEs") to participate in public works projects "to an extent approximating the level of [their] availability and capacity." Denver, Co., Rev.Mun.Code ch. 28, art. III, § 28-53 (Supp.1990). This Ordinance is the most recent in a series of provisions that the Denver City Council has adopted since 1983 to remedy perceived race

1. The Ordinance defines racial minorities as "person[s] of Black, Hispanic, Asian–American, or American Indian descent." Denver, Co., Rev. Mun.Code ch. 28, art. III, § 28-54 (Supp.1990).

and gender discrimination in the distribution of public and private construction contracts.[2]

The Ordinance imposes five requirements for a business to obtain certification as an MBE or WBE: (1) that it be 51 percent owned by one or more eligible racial minorities or women; (2) that it be managed and controlled by one or more eligible racial minorities or women; (3) that it has been actively in business for at least three months; (4) that the business demonstrate, by written documentation or affidavit, that it has suffered from past race or gender discrimination in Denver's construction industry; and (5) that it has not generated annual revenues that exceed $10 million for "building construction" or "heavy construction," $5 million for "special trade contractors," or $3 million for "engineering, accounting, research management and related services." Ordinance § 28–54; § 28–73(b)–(c); § 28–74. To maintain eligibility, an MBE or WBE must annually submit a renewal application that updates and reaffirms these certification requirements. § 28–73(d).

The Ordinance directs the Office of Contract Compliance ("OCC") to establish goals, on a project-by-project basis, for the participation level of MBEs and WBEs in city projects. Ordinance § 28–56. Prior to the solicitation of bids for a specified project, an MBE and/or WBE participation goal (measured as a percent of each project's design and construction cost) is set according to the OCC's assessment of the capacity and availability of MBEs and WBEs for the project. The statutory goals for total annual "construction" expenditures are 16 percent for MBEs and 12 percent for WBEs; the goal for "design services" is 10 percent for both MBEs and WBEs. Ordinance § 28–55(a). The Ordinance does not require the OCC to set participation goals for every project and the OCC often sets individual project goals below the annual goals levels.

If the OCC establishes a project goal, all bidders must demonstrate either how they intend to satisfy that goal or that they have made a good faith effort to do so. Satisfaction of one of these two standards renders a bidder eligible to compete, and the contract is then awarded to the lowest eligible bidder, regardless of the race or gender of that bidder.

To satisfy a project's goal, the bidder may: (1) itself be a certified MBE or WBE; (2) form a joint venture with a certified MBE or WBE; or (3) enlist certified MBEs and WBEs as subcontractors or suppliers. Ordinance § 28–57.[3] If the bidder cannot meet the project goal by one of these stated means, then it must submit a statement addressing the Ordinance's ten requirements to establish good faith.[4] Consistent with this

---

**2.** In addition to modifying the design of the initial program implemented in 1983, the 1990 Ordinance expanded its scope to include certain public contracts not previously covered.

**3.** Ordinance sections cited herein governing treatment of bids relate to construction, reconstruction, and remodelling projects. Largely similar provisions exist for design and construction services. Ordinance §§ 28–61 to 28–64.

**4.** Pursuant to § 28–58, the statement of good faith must include a specific response to the following:

(1) knowledge of information provided during a pre-bid meeting convened by the city to inform MBEs and WBEs of subcontracting opportunities on the project; (2) verification of advertisement soliciting bids from MBEs and WBEs, for three consecutive days, in general or construction-related publications approved by the OCC Director; (3) verification of efforts to contact, by timely written notice, all appropriate MBEs and WBEs within identified sub-

contracting categories; (4) verification of efforts to subcontract, consistent with industry practice, with the MBEs and WBEs whom the bidder has contacted or who have contacted the bidder; (5) verification that the bidder attempted to recruit MBEs and WBEs from at least the same geographical area from which it attempted to recruit other subcontractors and other members of a joint venture; (6) verification that, consistent with industry practice, the bidder afforded MBEs and WBEs necessary access to, and adequate time to review, all necessary project plans, drawings, specifications and other documents as well as adequate time to prepare subcontract bids and/or negotiate joint venture arrangements; (7) verification that, reasonably consistent with industry practice and the bidder's past practices on similar projects, the bidder selected portions of the work to be performed by MBEs and WBEs to achieve the project goals, including consideration of structuring the contract into economically feasible units to facilitate meaningful MBE and WBE participation as subcontractors or suppliers; (8) for each MBE and WBE who

good-faith standard, the prime contractor is not required to hire MBE or WBE subcontractors who are not the lowest bidders or who are unqualified. In other words, the project goals do not impose unyielding numerical quotas.

The Ordinance empowers the OCC to assess the credibility of a bidder's good-faith showing. If the OCC determines that the bidder has failed to comply with the Ordinance's requirements, the bid is deemed "nonresponsive" and the bidder is ineligible to receive the contract award. Ordinance § 28–59; § 28–64. However, the contractor may petition the OCC Director to conduct a hearing to review the finding of nonresponsiveness. § 28–33(a). If the contractor remains unsatisfied with the final ruling issued after the hearing, it may seek judicial review in state court pursuant to Col.R.Civ.P. 106(a)(4). § 28–33(d)–(e).

On January 6, 1992, Concrete Works, a nonminority and male-owned construction firm, commenced this Equal Protection Clause challenge to the Ordinance. Concrete Works alleged that the Ordinance caused it to lose three construction contracts for failure to comply with either the stated MBE and WBE participation goals or the good-faith requirements. Rather than pursuing administrative or state court review of the OCC's findings, Concrete Works initiated this action, seeking a permanent injunction against enforcement of the Ordinance and damages for lost contracts.

On February 26, 1993, and after extensive discovery, the district court granted Denver's summary judgment · motion. *Concrete Works, Inc. v. City and County of Denver,* 823 F.Supp. 821 (D.Colo.1993). The court concluded, albeit not without reservations, that Concrete Works had standing to bring this claim. With respect to the merits, the court held that Denver's program satisfied the strict scrutiny standard embraced by a majority of the Supreme Court in *Croson* because it was narrowly tailored to achieve a compelling government interest. First, the court determined that Denver's factual showing of past race and gender discrimination justified its compelling government interest in remedying such discrimination. *Id.* at 831–41. Second, the court reasoned that the program was narrowly tailored to meet that end because: (1) Denver first considered race- and gender-neutral means of increasing MBE and WBE participation; (2) the Ordinance creates a flexible scheme rather than a rigid numerical quota; (3) the Ordinance does not require prime contractors to hire an MBE or WBE subcontractor who fails to submit the lowest bid; and (4) the Ordinance applies only to contracts awarded by Denver for public works projects within the City and County of Denver. *Id.* at 841–45. Concrete Works timely appealed the court's summary judgment order.

## II. Procedural Posture and Standards of Review

### A. Standard of Review

■ We review de novo the grant of summary judgment and apply the same standard used by the district court. *Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.,* 912 F.2d 1238, 1241 (10th Cir.1990). Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). We examine the factual record and reasonable inferences therefrom in the light most favorable to Concrete Works, the party opposing summary judgment. *Applied Genetics,* 912 F.2d at 1241.

Denver, as the moving party, has the initial burden to show "that there is an absence of evidence to support the nonmoving party's case." *Bacchus Indus., Inc. v. Arvin Indus., Inc.,* 939 F.2d 887, 891 (10th Cir.1991) (quot-

---

contacted the bidder or whom the bidder contacted or attempted to subcontract with, a statement explaining why the bidder and the MBE or WBE did not succeed in reaching subcontracting or joint venture agreement; (9) verification that the bidder rejected MBEs and WBEs because the firms failed to submit the lowest bid or were not "qualified" under the terms of § 28–54; and (10) verification that the bidder attempted to assist MBEs and WBEs in obtaining bonds, if any were required.

ing *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986)). Once the moving party meets this burden, the burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material matter. *Id.* In so doing, the nonmoving party may not rest solely on the allegations in its pleadings, but must instead, by its "own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp.,* 477 U.S. at 324, 106 S.Ct. at 2553 (quoting Fed.R.Civ.P. 56(e)).

■ At the summary judgment stage, the judge's function is not to weigh the evidence and determine the truth of the matter. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). Nonetheless, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party," summary judgment in favor of the moving party is proper. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

### B. Standing

At the outset, we consider Denver's contention that Concrete Works fails to satisfy its burden of establishing standing to challenge the Ordinance's constitutionality. *See Lujan v. Defenders of Wildlife,* —— U.S. ——, ——, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992) (setting forth the burden of establishing standing). Although the district court ultimately ruled that Concrete Works does have standing, the court characterized the company's showing as "extraordinarily weak" because it "has not established that it was refused a contract because of the race or gender of its owner." *Concrete Works,* 823 F.Supp. at 827–28.

■ Just a few months after the district court entered its judgment, however, the Supreme Court clarified that a contractor who challenges a minority preference contract scheme on equal protection grounds need not show that it would have received a contract absent the city ordinance. *Northeastern Fla. Chapter of the Associated Gen. Contractors of America v. Jacksonville,* —— U.S. ——, ——, 113 S.Ct. 2297, 2299, 124 L.Ed.2d 586 (1993). The Court explained that, so long as the nonminority contractor can show that it was "able and ready to bid" on a contract subject to the ordinance, the requisite "injury in fact" under Article III arises from an inability to "compete [with minority contractors] on an equal footing" due to that ordinance's discriminatory policy. *Id.* at ——, 113 S.Ct. at 2303.

■ Guided by this principle, we conclude that Concrete Works has demonstrated "injury in fact" because it submitted bids on three projects and the Ordinance prevented it from competing on an equal basis with minority and women-owned prime contractors.[5] Specifically, the unequal nature of the bidding process lies in the Ordinance's requirement that a nonminority prime contractor must meet MBE and WBE participation goals by entering into joint ventures with MBEs and WBEs or hiring them as subcontractors (or satisfying the ten-step good faith requirement). In contrast, minority and women-owned prime contractors may use their own work to satisfy MBE and WBE participation goals. Ordinance § 28–57. Thus, the extra requirements impose costs and burdens on nonminority firms that preclude them from competing with MBEs and

---

5. It is undisputed that Concrete Works unsuccessfully competed for the Lakewood and Dry Gulch Storm Drainage Improvement Project, the Colorado Boulevard Median Improvement Project, and the Sixth and Josephine Avenue Improvement Project. With respect to the Sixth and Josephine Avenue Improvement Project, Concrete Works offered uncontested evidence that it submitted the lowest bid, but was deemed "nonresponsive" due to its failure to meet the project MBE goals or the good faith require-

ments. Instead, Denver awarded the contract to the second lowest bidder, who was given credit for 55 percent MBE participation because it was a certified MBE and stated its intent to perform 55 percent of the work. Thus, had Concrete Works "been granted the same racial preference given to [the second lowest bidder who was an MBE], its bid would have been considered in compliance with the MBE/WBE ordinance, and it would not have had its bid rejected as nonresponsive." Aplt.App. at 86.

WBEs on an equal basis.[6] *See Contractors Ass'n v. Philadelphia,* 6 F.3d 990, 995–96 (3d Cir.1993) (holding that nonminority contractors had standing to challenge a City of Philadelphia ordinance that closely parallels the Denver scheme—the ordinance requires a city agency to set MBE participation goals and authorizes it to issue waivers for nonminority general contractors who are unable to satisfy the goals after a good faith effort); *Cone Corp. v. Hillsborough County,* 5 F.3d 1397, 1399 (11th Cir.1993) (reversing, in the wake of *Northeastern Florida,* the district court's dismissal of nonminority contractor's suit because the county's contract program treated minority and nonminority contractors differently).

In addition to demonstrating "injury in fact," Concrete Works also satisfies the two remaining elements to establish standing: (1) a causal relationship between the injury and the challenged conduct; and (2) a likelihood that the injury will be redressed by a favorable ruling. *Northeastern Fla.,* — U.S. at ——, 113 S.Ct. at 2302 (citations omitted). Thus, we conclude that Concrete Works has standing to challenge the constitutionality of Denver's race- and gender-conscious contract program.

### C. Equal Protection Clause Standards

The final preliminary matter we must address is the standard of equal protection review that governs our analysis. The Fourteenth Amendment provides that "No State shall ... deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV.

We determine the appropriate standard of equal protection review by examining the nature of the classifications embodied in the statute. We apply strict scrutiny to the Ordinance's race-based preference scheme and thus inquire whether the statute is narrowly tailored to achieve a compelling government interest. *Croson,* 488 U.S. at 493–95, 109 S.Ct. at 721–23 (plurality) (adopting strict scrutiny test); *id.* at 520, 109 S.Ct. at 735–36 (Scalia, J., concurring in judgment) (supporting strict scrutiny standard of plurality). Gender-based classifications, in contrast, are evaluated under the intermediate scrutiny rubric, which provides that the law must be substantially related to an important government objective. *Mississippi Univ. for Women v. Hogan,* 458 U.S. 718, 723–24 & n. 9, 102 S.Ct. 3331, 3335–36, n. 9, 73 L.Ed.2d 1090 (1982); *Rowley v. Board of Educ.,* 863 F.2d 39, 40 (10th Cir.1988).

### III. Permissible Evidence and Burdens of Proof

In *Croson,* a plurality of the Court concluded that state and local governments have a compelling interest in remedying identified past and present discrimination within their borders. *Croson,* 488 U.S. at 492, 509, 109 S.Ct. at 721, 730. The plurality explained that the Fourteenth Amendment permits race-conscious programs that seek both to eradicate discrimination by the governmental entity itself and to prevent the public entity from acting as a "'passive participant' in a system of racial exclusion practiced by elements of the local construction industry" by allowing tax dollars "to finance the evil of private prejudice." *Id.* at 492, 109 S.Ct. at 721.[7]

---

**6.** Admittedly, the City of Jacksonville's ordinance at issue in *Northeastern Florida* differs from Denver's Ordinance inasmuch as the Jacksonville provision required the set-aside of 10 percent of the annual amount spent on city contracts to minority firms, whereas Denver imposes no such inflexible numerical goal. Nonminority firms in Denver may submit bids on every city project, while their counterparts in Jacksonville are foreclosed from bidding on those projects reserved for minority business enterprises. *Northeastern Fla.,* — U.S. at ——, 113 S.Ct. at 2299 (citation omitted). Nonetheless, what is dispositive for our standing analysis is that both ordinances "make[ ] it more difficult for members of one group to obtain a benefit than it is for members of another." *Id.* at ——, 113 S.Ct. at 2303.

**7.** Apparently, the three dissenting Justices agreed with the plurality that a municipality may design its procurement program to remedy discrimination in both the public and private sectors. *Croson,* 488 U.S. at 536–38, 109 S.Ct. at 744–45 (Marshall, J., dissenting). Only Justice Scalia's opinion concurring in the judgment espoused the view propounded by Concrete Works that the only instance in which the States may implement a race-conscious system is to "eliminate their own maintenance of a system of unlawful racial classification." *Id.* at 524, 109 S.Ct. at 738 (Scalia, J., concurring in judgment).

Before assessing whether Denver's factual support for its program satisfies the particularized showing of discrimination required by *Croson*, however, we address the parties' dispute over the geographical scope and the type of the statistical and anecdotal evidence that informs our analysis. Additionally, we set forth the burdens of production and proof.

### A. Geographic Scope of the Data

■ Concrete Works contends that *Croson* precludes us from considering empirical evidence of discrimination in the six-county Denver Metropolitan Statistical Area (MSA). Instead, it would allow Denver only to use data describing discrimination within the City and County of Denver.

A majority in *Croson* observed that because discrimination varies across market areas, state and local governments cannot rely on national statistics of discrimination in the construction industry to draw conclusions about prevailing market conditions in their own regions. *Id.* at 504, 109 S.Ct. at 727. The relevant area in which to measure discrimination, then, is the local construction market, but that is not necessarily confined by jurisdictional boundaries.

The Denver MSA is defined by the United States Office of Management and Budget according to the existence of a population nucleus and the high degree of economic and social integration in the region. Aplt.App. at 495. *Croson* supports our consideration of data from the Denver MSA because this data is sufficiently geographically targeted to the relevant market area. The record reveals that over 80 percent of Denver Department of Public Works ("DPW") construction and design contracts are awarded to firms located within the Denver MSA.

To confine the permissible data to a governmental body's strict geographical boundaries would ignore the economic reality that contracts are often awarded to firms situated in adjacent areas. It is important that the pertinent data closely relate to the jurisdictional area of the municipality whose program we scrutinize, but here Denver's contracting activity, insofar as construction work is concerned, is closely related to the Denver

MSA. *See Contractors Ass'n*, 6 F.3d at 1003–09 (considering data from the Philadelphia MSA). The Denver MSA is thus an excellent proxy for the local construction market. Therefore, we hold that data from the Denver MSA is adequately particularized for strict scrutiny purposes.

### B. Anecdotal Evidence

■ Concrete Works next argues that the district court committed reversible error by considering such non-empirical evidence of discrimination as testimony from minority and women-owned firms delivered during public hearings, affidavits from MBEs and WBEs, summaries of telephone interviews that Denver officials conducted with MBEs and WBEs, and reports generated during Office of Affirmative Action compliance investigations.

The selective anecdotal evidence about minority contractors' experiences, without more, would not provide a strong basis in evidence to demonstrate public or private discrimination in Denver's construction industry sufficient to pass constitutional muster under *Croson*. Personal accounts of actual discrimination or the effects of discriminatory practices may, however, vividly complement empirical evidence. Moreover, anecdotal evidence of a municipality's institutional practices that exacerbate discriminatory market conditions are often particularly probative. Therefore, the government may include anecdotal evidence in its evidentiary mosaic of past or present discrimination. *See Contractors Ass'n*, 6 F.3d at 1002–03 (weighing Philadelphia's anecdotal evidence); *Coral Constr. Co. v. King County*, 941 F.2d 910, 919 (9th Cir.1991) ("[T]he combination of convincing anecdotal and statistical evidence is potent."), *cert. denied*, —— U.S. ——, 112 S.Ct. 875, 116 L.Ed.2d 780 (1992); *Cone Corp. v. Hillsborough County*, 908 F.2d 908, 916 (11th Cir.) (supplementing Hillsborough County's statistical evidence with testimony from MBEs who filed complaints to the County about prime contractors' discriminatory practices), *cert. denied*, 498 U.S. 983, 111 S.Ct. 516, 112 L.Ed.2d 528 (1990). Concrete Works cites no case, and we have found

none, eschewing the consideration of anecdotal evidence.

In the context of employment discrimination suits arising under Title VII of the Civil Rights Act of 1964, the Supreme Court has stated that anecdotal evidence may bring "cold numbers convincingly to life." *International Bhd. of Teamsters v. United States,* 431 U.S. 324, 339, 97 S.Ct. 1843, 1856, 52 L.Ed.2d 396 (1977). In fact, the majority in *Croson* impliedly endorsed the inclusion of personal accounts of discrimination. *Croson,* 488 U.S. at 480, 109 S.Ct. at 714–15 (noting as a weakness in the City's case that the Richmond City Council heard "no direct evidence of race discrimination on the part of the city in letting contracts or any evidence that the city's prime contractors had discriminated against minority-owned subcontractors").

Accordingly, we deem anecdotal evidence of public and private race and gender discrimination appropriate supplementary evidence in our strict scrutiny calculus.

## C. Post–Enactment Evidence

■ Concrete Works lastly admonishes us to consider only evidence of discrimination that existed prior to Denver's enactment of the Ordinance. In other words, Concrete Works contends that any reports or studies that were published after September 4, 1990, the date the Ordinance was enacted, are devoid of probative value in assessing the constitutionality of the Ordinance.

In *Croson,* the Court underscored that a municipality "must identify [the] discrimination ... with some specificity *before* [it] may use race-conscious relief." *Croson,* 488 U.S. at 504, 109 S.Ct. at 727 (emphasis added). Absent any pre-enactment evidence of discrimination, a municipality would be unable to satisfy *Croson.* However, we do not read *Croson*'s evidentiary requirement as foreclosing the consideration of post-enactment evidence. Indeed, post-enactment evidence, if carefully scrutinized for its accuracy, will often prove quite useful in evaluating the remedial effects or shortcomings of the race-conscious program. This is especially true in the instant case, where Denver first implemented a limited affirmative action program

in 1983 and has since modified and expanded its scope.

The strong weight of authority endorses the admissibility of post-enactment evidence to determine whether an affirmative action contract program complies with *Croson.* See, e.g., *Contractors Ass'n,* 6 F.3d at 1003–04; *Harrison & Burrowes Bridge Constructors, Inc. v. Cuomo,* 981 F.2d 50, 60 (2d Cir.1992); *Coral Constr.,* 941 F.2d at 921. In *Contractors Association,* as here, the challenger sought prospective relief in the form of a permanent injunction. The Third Circuit sensibly reasoned that "[c]onsideration of post-enactment evidence is especially appropriate ... where the principal relief sought ... was an injunction," because "it makes sense to consider *all available evidence*" when contemplating prospective relief. *Contractors Ass'n,* 6 F.3d at 1004 (emphasis added).

We agree that post-enactment evidence may prove useful for a court's determination of whether an ordinance's deviation from the norm of equal treatment is necessary. Thus, evidence of discrimination existing subsequent to enactment of the 1990 Ordinance is properly before us.

## D. Burdens of Production and Proof

The Court in *Croson* struck down the City of Richmond's minority set-aside program because the City failed to provide an adequate evidentiary showing of past or present discrimination. *Croson,* 488 U.S. at 498–506, 109 S.Ct. at 723–28. Because the Fourteenth Amendment only tolerates race-conscious programs that narrowly seek to remedy identified discrimination, the Court in *Croson* explained that state and local governments "must identify that discrimination ... with some specificity before they may use race-conscious relief." *Id.* at 504, 109 S.Ct. at 727. The Court's benchmark for judging the adequacy of the government's factual predicate for affirmative action legislation was whether there exists a "*strong basis in evidence* for [the government's] conclusion that remedial action was necessary." *Id.* at 500, 109 S.Ct. at 725 (quoting *Wygant v. Jackson Bd. of Educ.,* 476 U.S. 267, 277, 106 S.Ct. 1842,

1849, 90 L.Ed.2d 260 (1986) (plurality opinion)) (emphasis added).[8]

 Although *Croson* places the burden of production on the municipality to demonstrate a "strong basis in evidence" that its race- and gender-conscious contract program aims to remedy specifically identified past or present discrimination, the Fourteenth Amendment does not require a court to make an ultimate judicial finding of discrimination before a municipality may take affirmative steps to eradicate discrimination. *Wygant,* 476 U.S. at 292, 106 S.Ct. at 1856–57 (O'Connor, J., concurring in part and concurring in the judgment). An affirmative action response to discrimination is sustainable against an equal protection challenge so long as it is predicated upon strong evidence of discrimination. *Croson,* 488 U.S. at 504, 109 S.Ct. at 727.

An inference of discrimination may be made with empirical evidence that demonstrates "a significant statistical disparity between the number of qualified minority contractors . . . and the number of such contractors actually engaged by the locality or the locality's prime contractors." *Id.* at 509, 109 S.Ct. at 730 (plurality). We do not read *Croson* to require, nor do we embrace, an attempt to craft a precise mathematical formula to assess the quantum of evidence that rises to the *Croson* "strong basis in evidence" benchmark. That must be evaluated on a case-by-case basis.

Further, the adequacy of a municipality's showing of discrimination must be evaluated in the context of the breadth of the remedial program advanced by the municipality. *Id.*

at 498, 109 S.Ct. at 724. Ultimately, whether a strong basis in evidence of past or present discrimination exists, thereby establishing a compelling interest for the municipality to enact a race-conscious ordinance, is a question of law. *Associated Gen. Contractors v. New Haven,* 791 F.Supp. 941, 944 (D.Conn. 1992). Underlying that legal conclusion, however, are factual determinations about the accuracy and validity of a municipality's evidentiary support for its program.

 Notwithstanding the burden of initial production that rests with the municipality, "[t]he ultimate burden [of proof] remains with [the challenging party] to demonstrate the unconstitutionality of an affirmative-action program." *Wygant,* 476 U.S. at 277–78, 106 S.Ct. at 1849 (plurality); *see also Johnson v. Transportation Agency,* 480 U.S. 616, 626–27, 107 S.Ct. 1442, 1449, 94 L.Ed.2d 615 (1987) (noting in the Title VII context that "[i]f [an affirmative action] plan is articulated as the basis for the employer's decision [to take race or gender into account in an employment decision], the burden shifts to the plaintiff to prove that the employer's justification is pretextual and the plan is invalid."); *Contractors Ass'n,* 6 F.3d at 1005 (explaining that "the Contractors, not the City, bear the burden of proof"). As Justice O'Connor's concurring opinion in *Wygant* explained, when the governmental entity

introduces its statistical proof as evidence of its remedial purpose, thereby supplying the court with the means for determining that the [entity] had a firm basis for concluding that remedial action was appropriate, it is incumbent upon the nonminority

8. A majority in *Croson* concluded that Richmond's evidence did not satisfy this standard. The Court first found unpersuasive the Richmond City Council's mere declaration that the program was "remedial." *Croson,* 488 U.S. at 500, 109 S.Ct. at 725 ("the mere recitation of a 'benign' or legitimate purpose for a racial classification is entitled to little or no weight"). The City's empirical evidence was also of scant probative value. Specifically, the Court discredited the statistical pool employed by the City to demonstrate discrimination in the construction industry. Whereas the City pointed to the disparity between the number of prime contracts awarded to minority firms and the City's minority population, the Court reasoned that a more appropriate comparison would be between the number of

contracts awarded to minority firms and the number of qualified minority contractors. *Id.* at 501–02, 109 S.Ct. at 725–26. The Court further observed that national data about discrimination in the construction industry offered little insight into the particular conditions in Richmond. *Id.* at 504, 109 S.Ct. at 727 ("If all a state or local government need do is find a congressional report on the subject to enact a set-aside program, the constraints of the Fourteenth Amendment Clause will, in effect, have been rendered a nullity."). The Court remained similarly unconvinced by the City's evidence of the low minority membership in local contractors' associations in the absence of data on the number of minority firms eligible for membership in these trade organizations. *Id.* at 503, 109 S.Ct. at 726–27.

[challengers] to prove their case; they continue to bear the ultimate burden of persuading the court that the [entity's] evidence did not support an inference of prior discrimination and thus a remedial purpose, or that the plan instituted on the basis of this evidence was not sufficiently "narrowly tailored." *Wygant*, 476 U.S. at 293, 106 S.Ct. at 1857 (O'Connor, J., concurring in part and concurring in the judgment). Thus, once Denver presented adequate statistical evidence of precisely defined discrimination in the Denver area construction market, it became incumbent upon Concrete Works either to establish that Denver's evidence did not constitute strong evidence of such discrimination or that the remedial statute was not narrowly drawn. Absent such a showing by Concrete Works, summary judgment upholding Denver's Ordinance would be appropriate.

It is "through the prism" of these evidentiary burdens, *Liberty Lobby*, 477 U.S. at 254, 106 S.Ct. at 2513, that we evaluate the record in Concrete Works' appeal from the district court's summary judgment ruling.

## IV. Evidentiary Predicate Underlying Denver's Ordinance

Having established the geographical scope and the type of evidence that must inform our equal protection analysis, as well as the governing burdens of production and proof, we turn to the principal question in this appeal: has Denver satisfied the compelling government interest prong of *Croson* by demonstrating a "strong basis in evidence" that its race- and gender-conscious contract program seeks to remedy identified past and present discrimination in the construction industry within its local area? *Croson*, 488 U.S. at 500, 109 S.Ct. at 725. In addressing this question, we are particularly mindful that this appeal comes to us at the summary judgment stage, where the court's task is not to weigh the evidence, but rather to discern whether "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." *Matsushita*, 475 U.S. at 587, 106 S.Ct. at 1356.

The evidence of discrimination that Denver presents to demonstrate a compelling government interest in enacting the Ordinance consists of three categories: (1) evidence of discrimination in city contracting from the mid–1970s to 1990; (2) data about MBE and WBE utilization in the overall Denver MSA construction market between 1977 and 1992; and (3) anecdotal evidence that includes personal accounts by MBEs and WBEs who have experienced both public and private discrimination and testimony from city officials who describe institutional governmental practices that perpetuate public discrimination.[9]

## A. Discrimination in the Award of Public Contracts

We begin by considering the evidence that Denver presents to demonstrate underutilization of MBEs and WBEs in the award of city contracts from the mid 1970s to 1990. As described more fully below, Denver offers persuasive pieces of evidence that, considered in the abstract, could give rise to an inference of race- and gender-based public discrimination on isolated public works projects.[10] However, the record also shows that

---

9. Concrete Works correctly notes that Fed. R.Civ.P. 6(d) requires a party who files a written motion to serve supporting affidavits with that motion. *Olson v. Stone*, 588 F.2d 1316, 1321 (10th Cir.1978). Denver does not contest that Exhibits I, J, K, L, M, N, O, P, and Q were not filed with its summary judgment motion, but instead were submitted with its reply brief. However, inasmuch as these exhibits respond to specific questions raised by Concrete Works in its brief in opposition to summary judgment, Aplee. App. at 65, the court properly considered them.

10. To demonstrate this underutilization of MBEs and WBEs, Denver employs the oft-used statistical device known as the "disparity index." *See*

*Contractors Ass'n*, 6 F.3d at 1005 (Third Circuit joining the First, Ninth, and Eleventh Circuits in relying on disparity indices to determine whether a municipality satisfies *Croson*'s evidentiary burden). The disparity index is calculated by dividing the percentage of MBE and WBE participation in city contracts by the percentage of MBEs and WBEs in the relevant population of local construction firms. A disparity index of 1 demonstrates full MBE and WBE participation, whereas the closer the index is to zero, the greater the MBE and WBE underutilization. Some courts multiply the disparity index by 100, thereby creating a scale between 0 and 100, with 100 representing full MBE or WBE utilization.

MBE and WBE utilization on public contracts as a whole during this period was quite strong in comparison to the total number of MBEs and WBEs within the local construction industry. Denver offers a rebuttal to this more general evidence, but it is clear that the weight to be given both to the general evidence and to the specific evidence relating to individual contracts presents genuine disputes of material facts. What follows is an analysis of the factual record and an identification of the genuine material issues of fact arising from the parties' competing evidence.

### (1) Federal Agency Reports of Discrimination in Denver

First, Denver offers federal agency reports of discrimination in Denver public contract awards. The record contains a summary of a 1978 study by the United States General Accounting Office ("GAO"), which shows that between 1975 and 1977 minority businesses were significantly underrepresented in the performance of Denver public contracts that were financed in whole or in part by federal grants. Aplt.App. at 349–51. Of the $56 million in federally-funded construction contracts that the DPW awarded between July 1975 and December 1977, only about $2.5 million (or less than five percent) was awarded to minority contractors. *Id.* at 351. According to GAO estimates at the time of its study, approximately 11 percent of the construction firms in the Denver MSA were owned by minorities. In addition, GAO identified certain DPW practices that adversely affected minority contractors' likelihood of participating in public works projects.[11]

Concrete Works argues that a material fact issue arises about the validity of this evidence because "the 1978 GAO Report was nothing more than a listing of the problems faced by all small firms, first starting out in business." However, Concrete Works ignores the GAO Report's empirical data, which quantifies the actual disparity between the utilization of minority contractors and their representation in the local construction industry. In addition, we note that the GAO Report reflects the findings of an objective third party. Because this data remains uncontested, notwithstanding Concrete Works' conclusory allegations to the contrary, the 1978 GAO Report provides evidence to support Denver's showing of discrimination.

Added to the GAO findings is a 1979 letter from the United States Department of Transportation ("US DOT") to William H. McNichols, Mayor of the City of Denver, describing the US DOT Office of Civil Rights' study of Denver's discriminatory contracting practices at Stapleton International Airport. Aplt.App. at 266–68. US DOT threatened to withhold additional federal funding for Stapleton because Denver had "denied minority contractors the benefits of, excluded them from, or otherwise discriminated against them concerning contracting opportunities at Stapleton," in violation of Title VI of the Civil Rights Act of 1964 and other federal laws. *Id.* at 266.[12]

The following data reflects the low level of MBE and WBE utilization on Stapleton contracts prior to Denver's adoption of an MBE and WBE goals program at Stapleton in 1981: for the years 1977 to 1980, respectively, MBE utilization was 0 percent, 3.8 percent, .7 percent, and 2.1 percent; data on WBE utilization was unknown for the years 1977 to 1979, and it was .05 percent for 1980. Aplt.App. at 265.

Like its unconvincing attempt to discredit the GAO Report, Concrete Works presents no evidence to challenge the validity of US DOT's allegations. Instead, Concrete Works contends that because the district court in the 1979 suit between Denver and the US

---

11. Among the impediments were the costs arising from pre-qualification requirements, the fact that DPW published solicitations in trade journals to which minority contractors did not subscribe due to budgetary constraints, and short time constraints often imposed in the bid solicitations.

12. When US DOT concluded that Denver had failed to comply with proposals to remedy this discrimination, litigation was commenced in the United States District Court for the District of Colorado. The parties ultimately settled the case in 1980 and, in 1981, Denver adopted a race- and gender-conscious contract program for federally-funded projects at Stapleton. Aplt.App. at 174, 269–70.

DOT determined that this letter constituted only initial determinations and not final findings following a hearing, Denver cannot use the letter as factual support in the instant case. However, Concrete Works fails to introduce evidence refuting the substance of US DOT's information, attacking its methodology, or challenging the low utilization figures for MBEs at Stapleton before 1981. Thus, Concrete Works has failed to create a genuine issue of fact about the conclusions in the US DOT's report.

In sum, the federal agency reports of discrimination in Denver's contract awards support Denver's contention that race and gender discrimination existed prior to the enactment of the challenged Ordinance.

### (2) Denver's Reports of Discrimination

Denver points to evidence of public discrimination prior to 1983, the year that the first Denver ordinance was enacted.[13] A 1979 DPW "Major Bond Projects Final Report," which reviewed MBE and WBE utilization on projects funded by the 1972 and 1974 bond referenda and the 1975 and 1976 revenue bonds, showed strong evidence of underutilization of MBEs and WBEs. Aplt. App. at 353–55.[14] Based on this Report's description of the approximately $85 million in contract awards, there was 0 percent MBE and WBE utilization for professional design and construction management projects, and less than 1 percent utilization for construction. *Id.* at 354–55. The Report concluded that if MBEs and WBEs had been utilized in the same proportion as found in the construction industry, 5 percent of the contract dollars would have been awarded to MBEs and WBEs.

To undermine this stark data, Concrete Works alleges that the DPW Report contained "no information about the number of minority or women owned firms that were used" on these bond projects. Aplt.App. at 173. However, the Report's description of MBE and WBE utilization in terms of contract dollars provides a *more* accurate depiction of total utilization than would the mere number of MBE and WBE firms participating in these projects. Thus, this line of attack by Concrete Works is unavailing.

On the other hand, Concrete Works advanced expert testimony that Denver's data demonstrates strong MBE and WBE utilization on the total DPW contracts awarded between 1978 and 1982. Aplt.App. at 104, 356. For example, although MBEs represented 2 percent of the construction firms in the Denver MSA in 1977, MBEs received 6 percent of all DPW contract dollars—in other words, a disparity index of 3. Aplt.App. at 356. Further, the MBE disparity ratio for DPW contracts in 1982 was 12, because MBEs still represented 2 percent of the construction firms, yet received 24 percent of DPW contract dollars. *Id.*[15]

The same discrepancy between underutilization of MBEs and WBEs on some specifically identified DPW projects, and strong utilization in the overall DPW data exists as well in the post–1983 evidence on which Denver relies. Concrete Works observed that, for the years 1983 to 1989, the MBE disparity index was at least 3 in the overall DPW data and that MBEs received an average of 17.4 percent of DPW contract dollars. *Id.* at 105, 318.

However, Denver forcefully responds by pointing out that because federal and city

---

13. In response to this pre–1983 evidence of discrimination and additional information gleaned during public hearings convened in 1983, the Denver City Council enacted Ordinance No. 246 in 1983 to extend the Stapleton MBE and WBE utilization goals program to other DPW projects.

14. The projects included McNichols Sports Arena, an Engineering and Operations Center, the Police Administration Building and Detention Facility, the Fire Department Headquarters, Boettcher Concert Hall, Mile High Stadium, and two city parking facilities. Aplt.App. at 354.

15. The record does not indicate whether the overall DPW data between 1978 and 1982 includes the low MBE and WBE utilization on DPW projects funded by the 1972 and 1974 bond referenda and the 1975 and 1976 revenue bonds. If these specific projects are in fact a subset of the overall DPW data, then we can infer that the MBE and WBE disparity index for other projects exceeded 3 in 1978 and 12 in 1982. This would further undercut Denver's pre–1983 data. However, the fact that we cannot tell from the record what comprised the overall DPW empirical data only serves to highlight that summary judgment on this record was premature.

affirmative action programs were in place from the mid–1970s to the present, this overall DPW data reflects the intended remedial effect on MBE and WBE utilization of these programs. *Id.* at 274.[16] Based on its contention that the overall DPW data was therefore "tainted" and distorted by these pre-existing affirmative action goals programs, Denver asks us to focus instead on the data generated from specific public contract programs that were, for one reason or another, insulated from federal and local affirmative action goals programs, i.e. "non-goals public projects." Given that the same local construction industry performed both goals and non-goals public contracts, *id.* at 275, Denver argues that data generated on non-goals public projects offers a control group with which we can compare MBE and WBE utilization on public contracts governed by a goals program and those insulated from such goal requirements. Denver argues that the utilization of MBEs and WBEs on non-goals projects is the better test of whether there has been discrimination historically in Denver contracting practices.

In any event, the first data from non-goals public projects that Denver identifies are MBE and WBE disparity indices on Denver Department of General Services ("DGS") contracts, which represent one-third of all city construction funding and which, prior to the enactment of the 1990 Ordinance, were not subject to the goals program instituted in the earlier ordinances for DPW contracts.

*Id.* at 297.[17] The DGS data reveals extremely low MBE and WBE utilization. For MBEs, the DGS data shows a .14 disparity index in 1989 and a .19 disparity index in 1990—evidence of significant underutilization. Aplee.App. at 298–301. For WBEs, the disparity index is .47 in 1989 and 1.36 in 1990—the latter showing greater than full participation and the former demonstrating underutilization. *Id.*

These MBE disparity indices for DGS projects approximate those in other cases where courts have applied the "strong basis in evidence" standard in *Croson.*[18] The Eleventh Circuit held that a .11 disparity "clearly constitutes a prima facie case of discrimination indicating that the racial classifications in the County plan were necessary" under *Croson. Cone Corp.,* 908 F.2d at 916. In light of a disparity index of .22, the Ninth Circuit upheld the denial of a preliminary injunction to a challenger of the City of San Francisco's affirmative action program based upon an equal protection claim. *Associated Gen. Contractors, Inc. v. Coalition for Economic Equity,* 950 F.2d 1401, 1414 (9th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1670, 118 L.Ed.2d 390 (1992). Similarly, the Third Circuit concluded that a disparity of .04 was "probative of discrimination in City contracting in the Philadelphia construction industry." *Contractors Ass'n,* 6 F.3d at 1005.[19]

Denver's DGS evidence is more comprehensive than the evidence in *O'Donnell*

16. The record does not clarify the nature or scope of the federal and local programs in effect prior to Denver's enactment of the first race- and gender-conscious Ordinance in 1983.

17. The DGS data was generated in the 1991 Denver Disparity Study for Goods, Services, and Remodeling, which explored both quantitative and qualitative evidence. Aplee App. at 250–417. DGS construction contracts are labelled "remodeling" projects on existing infrastructure and public buildings and work ordered pursuant to change orders. Aplt.App. at 297. Denver states that DGS contracts represent one-third of all city construction funding, but does not specify what percentage of DGS contracts are the "remodeling" projects on which it relies to show past discrimination.

18. As the Third Circuit recently noted, "[a]lthough not all of these cases explicitly compute disparity indices, each relies on the percentage

disparities to find a pattern of discrimination." *Contractors Ass'n,* 6 F.3d at 1005 n. 14.

19. We do not have the benefit of relevant authority with which to compare Denver's disparity indices for WBEs. *See Contractors Ass'n,* 6 F.3d at 1009–11 (reviewing case law and noting that "it is unclear whether statistical evidence as well as anecdotal evidence is required to establish the discrimination necessary to satisfy intermediate scrutiny, and if so, how much statistical evidence is necessary"). Nevertheless, Denver's data indicates significant WBE underutilization such that the Ordinance's gender classification arises from "reasoned analysis rather than through the mechanical application of traditional, often inaccurate, assumptions." *Mississippi Univ. of Women,* 458 U.S. at 726, 102 S.Ct. at 3337 (striking down, under the intermediate scrutiny standard, a state statute that excluded males from enrolling in a state-supported professional nursing school).

*Constr. Co. v. District of Columbia,* 963 F.2d 420, 424–28 (D.C.Cir.1992), where the court reversed a denial of a preliminary injunction for the challenger because the District of Columbia failed to demonstrate a "strong basis in evidence" for its contract program. There, the District of Columbia provided data of minority utilization for construction contracts let by only one government agency in one year. Although this data showed that 3.4 percent of the construction dollars went to minority firms, the data also revealed that the same agency awarded in excess of 30 percent of repairs, improvement, and architectural contracts, and nearly 25 percent of material management contracts, to minority firms. The District of Columbia additionally failed to provide any data about discrimination in the private construction industry and relied on data generated before an amendment to the ordinance narrowed the eligibility pool to firms whose principal place of business was the District of Columbia or who successfully demonstrated that they were "local business enterprises."

The second set of data reflecting distinct MBE and WBE underutilization on non-goals public projects consists of separate DPW projects on which no goals program was imposed.[20] In this category, Denver offered data about MBE and WBE utilization on the 1985 Housing Bond and Museum of Natural History Projects and unnamed bond projects between 1972 and 1977. Aplt.App. at 274–75.[21] For the Housing Bond Project, the MBE disparity index was .43 and WBE disparity index was .09. *Id.* at 275. Similarly, the MBE disparity index for the Museum Project was .48 and the WBE figure was .40. *Id.* And finally, the MBE disparity index on the 1972 to 1976 bond projects was .63, while the WBE disparity index was .29. *Id.*

Concrete Works attempts to trivialize the significance of this data by contending that the projects, in dollar terms, reflect a small fraction of the total Denver MSA construction market. But Concrete Works misses the point. The data is not intended to reflect conditions in the overall market; it instead speaks solely to the utilization levels for city-funded projects on which no MBE and WBE goals were imposed. It is particularly telling that the disparity index significantly deteriorates on projects for which the city did not establish minority and gender participation goals. Insofar as Concrete Works does not attack the data on any other grounds, we consider it as persuasive evidence of underlying discrimination in the Denver construction market.

The third evidentiary item supporting Denver's contention that public discrimination existed prior to enactment of the challenged Ordinance is empirical data from 1989, generated after Denver modified its race- and gender-conscious program. In the wake of *Croson,* Denver amended its program by eliminating the minimum annual goals program for MBE and WBE participation and by requiring MBEs and WBEs to demonstrate that they had suffered from past discrimination. Aplt.App. at 312. This modification resulted in a noticeable decline in the share of DPW construction dollars awarded to MBEs. From 1985 to 1988 (prior to the 1989 modification of Denver's program), DPW construction dollars awarded to MBEs ranged from 17 to nearly 20 percent of total dollars. However, the figure dropped to 10.4 percent in 1989, after the program modifications took effect. *Id.* at 318. Like the DGS and non-goals DPW projects, this 1989 data further supports the inference that MBE and WBE utilization significantly declines after deletion of a goals program or relaxation of the minimum MBE and WBE utilization goal requirements.

Nonetheless, we must consider Denver's empirical support for its contention that public discrimination existed prior to the enact-

20. According to Denver, when the bond projects from the 1979 DPW Report are included, the record contains evidence of approximately $180 million in DPW projects that were not subject to the goals program. Aplt.App. at 275.

21. The record does not indicate why these DPW projects were not subject to the goals program, but Concrete Works does not dispute that this was the case. Evidently, although the 1983 Ordinance required the City to set MBE and WBE goals on the 1985 Housing Bond Project, no goals were established and funding was approved. Aplt.App. at 387.

ment of the Ordinance in the context of the overall DPW data, which shows consistently strong MBE and WBE utilization from 1978 to the present. Although Denver's argument may prove persuasive at trial that the non-goals projects are the most reliable indicia of discrimination, the record on summary judgment contains two sets of data, one that gives rise to an inference of discrimination and the other that undermines such an inference. This discrepancy highlights why summary judgment was inappropriate on this record.

The uncertainty about the capacity of MBEs and WBEs in the local market to compete for, and perform, the public projects for which there was underutilization of MBEs and WBEs further highlights why this record is not ripe for summary judgment. Although Denver's data uses as its baseline the percentage of firms in the local construction market that are MBEs and WBEs, Concrete Works argues that a more accurate indicator would consider the capacity of local MBEs and WBEs to undertake the work. *See Croson*, 488 U.S. at 501–02, 109 S.Ct. at 726 ("[W]here special qualifications are necessary, the relevant statistical pool for purposes of demonstrating discriminatory exclusion must be the number of minorities *qualified to undertake the particular task.*") (emphasis added). Concrete Works hypothesizes that, given the relatively small average size of local MBEs and WBEs, there may not have been MBEs available to perform work on DGS contracts or DPW projects on which no goals were imposed. Aplt.App. at 107–09.

We agree with the other circuits which have interpreted *Croson* impliedly to permit a municipality to rely, as does Denver, on general data reflecting the number of MBEs and WBEs in the marketplace to defeat the challenger's summary judgment motion or request for a preliminary injunction. *See Contractors Ass'n*, 6 F.3d at 1005 (comparing MBE participation in city contracts with the "percentage of [MBE] availability or compo-

sition in the 'population' of Philadelphia area construction firms"); *Associated Gen. Contractors*, 950 F.2d at 1414 (relying on availability data to conclude that city presented "detailed findings of prior discrimination"); *Cone Corp.*, 908 F.2d at 916 (statistical disparity between "the total percentage of minorities involved in construction and the work going to minorities" shows that "the racial classification in the County plan [was] necessary").

■ Nevertheless, Concrete Works has identified a legitimate factual dispute about the accuracy of Denver's data and questioned whether Denver's reliance on the percentage of MBEs and WBEs available in the marketplace overstates "the ability of MBEs or WBEs to conduct business relative to the industry as a whole because M/WBEs tend to be smaller and less experienced than nonminority-owned firms." Aplt.App. at 107. In other words, a disparity index calculated on the basis of the absolute *number* of MBEs in the local market may show greater underutilization than does data that takes into consideration the *size* of MBEs and WBEs.[22] We do not mean to imply that availability is not an appropriate barometer to calculate MBE and WBE utilization, nor do we cast aspersions on data that simply uses raw numbers of MBEs and WBEs compared to numbers of total firms in the market. However, once credible information about the size or capacity of the firms is introduced in the record, it becomes a factor that the court should consider.

Denver has several responses. It argues that a construction firm's precise "capacity" at a given moment in time belies quantification due to the industry's highly elastic nature. Aplt.App. at 279. Furthermore, DPW contracts represent less than 4 percent of total MBE revenues and less than 2 percent of WBE revenues in 1989, thereby strongly implying that MBE and WBE participation in DPW contracts did not render these firms

---

**22.** To use an example to illustrate this point, if MBEs represent 10 percent of the total *number* of firms in the market and receive 5 percent of the total city contract dollars, the disparity index would be .5, and it could be inferred from this that discrimination exists. However, if all the MBEs were small firms averaging only one-fourth the size of the average firm in the market, then the award of 5 percent of the total city contract dollars to those MBEs could be argued not to reflect underutilization of the *capacity* of MBEs in the market to do the work because they represent only 2½% of the capacity.

incapable of concurrently undertaking additional work. Aplt.App. at 273. Denver presented evidence that most MBEs and WBEs have never participated in city contracts, "although almost all firms contacted indicated that they were interested in City work." Aplt.App. at 273, 278. Of those MBEs and WBEs who have received work from DPW, available data showed that less than 10 percent of their total revenues were from DPW contracts. *Id.*

Again, all of this back and forth argument highlights that there are genuine and material factual disputes in the record. Such disputes about the accuracy of Denver's data should not be resolved at summary judgment. *Liberty Lobby,* 477 U.S. at 249, 106 S.Ct. at 2510–11.

## B. Evidence of Private Discrimination in the Denver MSA

In recognition that a municipality has a compelling interest in taking affirmative steps to remedy both public and private discrimination specifically identified in its area, *Croson,* 488 U.S. at 492, 109 S.Ct. at 721, we also consider data about conditions in the overall Denver MSA construction industry between 1977 and 1992. Given that DPW and DGS construction contracts represent approximately 2 percent of all construction in the Denver MSA, Denver MSA industry data sharpens the picture of local market conditions for MBEs and WBEs.

According to Denver's expert affidavits, the MBE disparity index in the Denver MSA was .44 in 1977, .26 in 1982, and .43 in 1990. Aplt.App. at 271–74. The corresponding WBE disparity indices were .46 in 1977, .30 in 1982, and .42 in 1989. *Id.* This pre-enactment evidence of the overall Denver MSA construction market—i.e. combined public and private sector utilization of MBEs and WBEs—gives rise to an inference that local prime contractors discriminated on the basis of race and gender.[23]

Rather than offering any evidence in rebuttal, Concrete Works merely states that this empirical evidence does not prove that the Denver government itself discriminated against MBEs and WBEs. Concrete Works asks us to define the appropriate market as limited to contracts *with* the City and County of Denver. Such a request, however, ignores the lesson of *Croson* that a municipality may design programs to prevent tax dollars from "financ[ing] the evil of private prejudice." *Croson,* 488 U.S. at 492, 109 S.Ct. at 721; *accord Contractors Ass'n,* 6 F.3d at 1002; *Coral Constr.,* 941 F.2d at 916.

What the Denver MSA data does not indicate, however, is whether there is any linkage between Denver's award of public contracts and the Denver MSA evidence of industry-wide discrimination. That is, we cannot tell whether Denver indirectly contributed to private discrimination by awarding public contracts to firms that in turn discriminated against MBE and/or WBE subcontractors in other private portions of their business or whether the private discrimination was practiced by firms who did not receive any public contracts. Neither *Croson* nor its progeny clearly state whether private discrimination that is in no way funded with public tax dollars can, by itself, provide the requisite strong basis in evidence necessary to justify a municipality's affirmative action program. A plurality in *Croson* simply suggested that remedial measures could be justified upon a municipality's showing that "it had essentially become a 'passive participant' in a system of racial exclusion practiced by elements of the local construction industry." *Croson,* 488 U.S. at 492, 109 S.Ct. at 721. Although we do not read *Croson* as requiring the municipality to identify an exact linkage between its award of public contracts and private discrimination, such evidence would at least enhance the municipality's factual predicate for a race- and gender-conscious program. The record before us

---

23. Post-enactment evidence contained in the record indicates that MBE and WBE underutilization persisted in 1992. A report of MBE and WBE utilization in the Denver–Boulder market completed in 1992 for the Regional Transit District ("RTD") concluded that the MBE disparity index was .08 and the WBE disparity index was .32—evidence of continued significant statistical disparities. Aplee.Supp. at 488–90. Although this study used a "disparity ratio," which is the inverse of a disparity index, Denver converted the data to a disparity index for the convenience of comparison with earlier data. Aplee.Br. at 28.

does not explain the Denver government's role in contributing to the underutilization of MBEs and WBEs in the private construction market in the Denver MSA, and this may well be a fruitful issue to explore at trial.

### C. Anecdotal Evidence

Lastly, the record contains numerous personal accounts by MBEs and WBEs, as well as prime contractors and city officials, describing discriminatory practices in the Denver construction industry. Aplt.App. at 380–90. Such anecdotal evidence was collected during public hearings in 1983 and 1988, interviews, the submission of affidavits, and case studies performed by a consulting firm that Denver employed to investigate public and private market conditions in 1990, prior to the enactment of the 1990 Ordinance.

As noted above, anecdotal evidence about minority- and women-owned contractors' experiences can bolster empirical data that gives rise to an inference of discrimination. While a factfinder should accord less weight to personal accounts of discrimination that reflect isolated incidents, anecdotal evidence of a municipality's institutional practices carry more weight due to the systemic impact that such institutional practices have on market conditions.

Here, in addition to the individual accounts of discrimination that MBEs and WBEs have encountered in the Denver MSA, City affirmative action officials explained that change orders offered a convenient means of skirting project goals by permitting what would otherwise be a new construction project (and thus subject to the MBE and WBE participation requirements) to be characterized as an extension of an existing project and thus within DGS's bailiwick. *Id.* at 387. An assistant city attorney also revealed that projects have been labelled "remodeling," as opposed to "reconstruction," because the former fall within DGS and thus were not subject to MBE and WBE goals prior to the enactment of the 1990 Ordinance. *Id.* at 386. Contrary to Concrete Works' protestations, this anecdotal evidence may be considered in conjunction with Denver's statistical analysis.

### D. Summary

Given the unresolved questions of material facts identified above about the accuracy of Denver's public and private discrimination data, we conclude that summary judgment was inappropriate on this record. To be sure, Denver has compiled substantial evidence to support its contention that the Ordinance was enacted to remedy past race- and gender-based discrimination. Standing in marked contrast to the predicate facts on which Richmond unsuccessfully relied in *Croson*, Denver's evidence of discrimination both in the award of public contracts and within the overall Denver MSA is particularized and geographically targeted. We further emphasize that Denver need not negate all evidence of non-discrimination, nor is it Denver's burden to *prove* judicially that discrimination did exist. Rather, Denver need only come forward with a "strong basis in evidence" that its Ordinance was a narrowly-tailored response to specifically identified discrimination. Then it becomes Concrete Works' burden to show that there is no such strong basis in evidence to support Denver's affirmative action legislation.

At the same time, however, our duty on summary judgment is not to resolve genuine material fact disputes between the parties. *Liberty Lobby*, 477 U.S. at 249, 106 S.Ct. at 2510–11. Concrete Works has specifically identified potential flaws in Denver's data and has put forth evidence that Denver's data fails to support an inference of either public or private discrimination. *Croson*, 488 U.S. at 493, 109 S.Ct. at 721 (explaining that "searching judiciary inquiry into the justification for such race-based measure" is necessary to assure "that the legislative body is pursuing a goal important enough to warrant use of a highly suspect tool").

With respect to Denver's evidence of public discrimination, for example, overall DPW data demonstrates strong MBE and WBE utilization, yet data for isolated DPW projects and DGS contract awards suggests to the contrary. The parties offer conflicting rationales for this disparate data and the record before us does not provide a clear explanation. In addition, Concrete Works' legitimate contention that Denver's disparity

indices fail to consider the relatively small size of MBEs and WBEs further impedes our ability to draw conclusions from the existing record. On remand, the parties should be permitted to develop a factual record to support their competing interpretations of the empirical data.

Our decision to reverse the district court's order and to remand for a trial in no way reflects our judgment of Denver's likelihood of success at trial on the existing factual record. Rather, we simply conclude that there are genuine issues of material fact in dispute, and thus these factual disputes must be resolved at trial. *See Contractors Ass'n*, 6 F.3d at 1007 (Philadelphia's "statistical evidence has created an inference of discrimination which the Contractors would have to rebut at trial by either proving a 'neutral explanation' for the disparity, 'showing the statistics are flawed, ... demonstrating that the disparities shown by the statistics are not significant or actionable, ... or presenting contrasting statistical data.' ") (internal quotations omitted); *see Coral Constr.*, 941 F.2d at 921 (reversing summary judgment in favor of municipality, and remanding for trial, to permit the challenger to rebut the municipality's statistical evidence offered in support of its MBE program).

### V. Conclusion

Accordingly, we REVERSE and REMAND for further proceedings.[24]

---

24. Because Concrete Works does not challenge the district court's conclusion with respect to the second prong of *Croson*'s strict scrutiny standard—i.e. that the Ordinance is narrowly tailored to remedy past and present discrimination—we need not address this issue. The summary allegation in amici's brief that the Ordinance is not narrowly tailored does not suffice to preserve this issue on appeal.